BARBARA A. GREEN

*v.*

GEORGE V. DIETRICH.

*Filed at Ottawa November 14, 1885.*

1. VENDOR AND PURCHASER—*right of the latter to buy in outstanding superior title.* The purchaser of land, while in possession under his contract of purchase, is under no obligation to maintain his vendor's title, and the law does not forbid him from buying an outstanding title to the premises, and asserting it against his vendor.

2. So where the purchaser entered into possession under an agreement that the purchase money was not to be paid unless the vendor should, within three years, make him a warranty deed conveying a perfect title, and in case of failure to make him such conveyance the purchaser was to remain in possession of the premises for the period of three years, and pay a reasonable rent for the time he could hold peaceable possession, and before the expiration of the three years he acquired the title from other parties, it was *held,* that there was nothing in the relation of the parties, under the original contract or otherwise, that prevented the purchaser from yielding to the superior title and purchasing the same, and in that way secure his peace.

3. LANDLORD AND TENANT—*whether the relation exists—as between vendor and purchaser.* In such case the relation of landlord and tenant did not exist between the parties after the expiration of the three years. The purchaser was not bound to pay rent after that time, he having in the meantime acquired title to the premises from another source independent of his vendor, and the "reasonable rent" the purchaser was to pay on failure of his vendor to make a deed, was intended as compensation for the use of the land for such period as he might peaceably hold possession during the three years.

4. TRUST—*sufficiency of evidence to show land was bought for another.* Where a person, after taking possession of land under a contract of purchase, by which he is not required to pay the contract price unless his vendor shall acquire the title to the same within three years, purchases from others the superior title, under which he claims the property as his own, in order to show that his subsequent purchase of the title was for his original vendor under a verbal contract to that effect, it is incumbent on the party claiming the trust to establish the existence of such verbal contract by a clear preponderance of evidence.

5. So after the lapse of many years, and after the death of the party so purchasing, the testimony to establish a verbal contract that the purchase was made for another, should be of the most satisfactory character, and evidence of the admissions and statements of the party, in casual conversations, shown after his death, are too unreliable to justify a decree divesting the title of his heirs long after his death.

6. LACHES—*as against a claim of a trust in land.* Where a person purchased in the outstanding titles to land in his own name, presumably for his own use, and for several years after and until his death held the land under such title as his own, and his widow and heir held the same for thirteen years after his death, and expended considerable sums in improvements upon the property before bill was filed by another claiming that the purchase was made for his benefit, it was *held*, that the *laches* was such as to prevent equitable relief.

APPEAL from the Circuit Court of Knox county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. WILLOUGHBY & DOUGHERTY, for the appellant:

This was a contract for the payment, by Alfred Thurman, of $3500 three years from its date, November 2, 1864, provided S. B. Allen should, within that time, make a deed to Thurman conveying a perfect title to the land in controversy. This he could not do, for the reason that at no time during the three years did he have even color of title.

It is claimed that Thurman bought the titles for the benefit of S. B. Allen, he to be credited on the purchase price of whatever they cost him. To this we reply, that such agreement is not shown by the proofs, and if made, was void, as being an agreement in parol concerning an interest in land. *Sheldon* v. *Harding,* 44 Ill. 73.

Thurman and those claiming under him have been in the possession of this land since August 17, 1865, claiming adversely to S. B. Allen. If Thurman was a tenant, at the close of the tenancy he could disclaim and set up adverse title in himself. *McGuffie* v. *Carter,* 42 Mich. 499; *Page* v. *Kinsman,* 43 N. H. 328; *Despard* v. *Walbridge,* 15 N. Y. 377; *Insurance Co.* v. *McKenzie,* 10 C. B. (N. S.) 1870; 1 Taylor on Landlord and Tenant, sec. 629; 1 Washburn on Real Prop. 369.

Thurman took possession as a purchaser and not as a tenant, and a purchaser in possession is not estopped to set up an adverse title. *Bright's Lessee* v. *Rochester,* 7 Wheat. 547; *Jackson* v. *Johnson,* 5 Cow. 74.

Whatever equities, if any, ever existed against the appellant, have been lost by gross *laches.* *Rose* v. *Swann,* 56 Ill. 40; *Wilson* v. *Walkins,* 3 Pet. 43.

Messrs. SANFORD & CARNEY, for the appellee:

The contract between the parties, dated November 2, 1864, was more than a contract of purchase. It provided that if Allen failed to make the title, Thurman owes Allen a reasonable rent. If Thurman was a tenant of Allen, the appellant, succeeding in the possession, was also a tenant. Angell on Limitations, sec. 442; *Hardin* v. *Forsythe,* 99 Ill. 312.

The titles which Thurman acquired under the sheriff's deed and the Boylin deed were acquired by him in the interest of Allen, and as a part compliance on the part of Thurman. He was to be credited on his contract for the same.

Owing to the relations of the parties the contract was not within the Statute of Frauds. *Moon* v. *Titman,* 44 Ill. 367; *O'Halloran* v. *Fitzgerald,* 71 id. 53.

Owing to the trust and relations of the parties, *laches* can not avail as a defence. *McNamara* v. *Garrity,* 106 Ill. 384; Angell on Limitations, secs. 437-447; *Lowe* v. *Emerson,* 48 Ill. 160; *Rigg* v. *Cook,* 4 Gilm. 351; *Zellar's Lessee* v. *Eckhart,* 4 How. 295; *Hancock* v. *Harper,* 86 Ill. 445.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The bill in this case was brought by George V. Dietrich, in the circuit court of Knox county, against Florence Green and Barbara A. Green, and is to compel a specific performance of a contract made by and between Stephen B. Allen and Alfred Thurman, since deceased, for the sale to Thurman of the premises involved in this litigation.   One of the defendants, Barbara A. Green, is the widow of Alfred Thurman, and the other, Florence Green, is his only child and heir-at-law. Whatever title Alfred Thurman had in the premises is now claimed by defendant Barbara A. Green.   Complainant alleges that whatever title Stephen B. Allen had to the property in controversy. has since been acquired by him through certain *mesne* conveyances, and he asks by his bill to have the written contract between Alfred Thurman and Stephen B. Allen, in regard to the land, performed by defendants in his favor, if they shall elect to do so, and on their failure to perform such contract, that certain titles which it is alleged Thurman acquired to the property, be declared to have been held by him in trust for Stephen B. Allen and his grantee, and that defendants be decreed to convey such titles as they have, by inheritance or otherwise, to complainant, and for other relief.   On the hearing in the circuit court, it was decreed substantially according to the prayer of the bill, and defendant Barbara A. Green brings the case to this court, and assigns numerous errors on the record.

The agreement between Allen and Thurman, concerning the land, was entered into on the 2d day of November, 1864. It recited that Allen had sold to Thurman the land described in the bill, for $3500, to be paid within three years from the date of the contract, with interest at the rate of seven per cent per annum, but the purchase money was not to be paid until the vendor should make and deliver to the vendee or his legal representatives a good and sufficient warranty deed

therefor, with a perfect title to the premises. The agreement contained the following paragraph: "It is further agreed between the said parties hereto, that in case the said Stephen B. Allen or his legal representatives shall fail to make, execute and deliver unto the said Alfred Thurman or his legal representatives said deed of conveyance, as before stated, the said Thurman shall have full and continued possession of said premises until the expiration of three years, to pay all taxes which may be hereafter assessed on said premises; and in case of the failure aforesaid of the party of the first part to make said deed, the said Thurman is to pay the said Allen a reasonable rent for said premises so long as he can hold peaceable possession of the same." It may be necessary further on to give a construction to this clause of the contract. At the time this contract was made there is no pretence that Allen had any legal title to the land. All he had was possession, and that he delivered to Thurman. Nor is it claimed he was in a position, at any time within three years after the date of the contract, to make a perfect title of the land to Thurman. It is clearly proved that Stephen B. Allen did not then have any legal title to the land, nor has he since acquired such legal title. Whether he had any equitable title that he could convey to complainant, must depend on what conclusion shall be reached as to the titles subsequently acquired by Thurman from other sources,—that is, whether Thurman acquired such titles for himself in his own right, or as trustee for Allen and his grantee.

It seems Everett Messenger and William H. McWhirter were sureties for Stephen B. Allen in some matters, and in order to indemnify them, he made to them an equitable assignment of his contract with Alfred Thurman, concerning this tract of land. After the death of Everett Messenger, to make that assignment more effective he made a deed of the land to M. J. Messenger, the administrator of Everett Messenger, deceased. Since then, Frank S. Murphy bought of

M. J. Messenger whatever interest in the land he obtained by his deed from Allen, for the sum of $1000, and for his convenience had the deed made to complainant. In his deposition Stephen B. Allen distinctly states he derived title to this land from his brother, Elisha B. Allen, by a deed sent to him from Oregon, and that he never had any title to the land until he received that deed. All the title complainant has to the land in controversy is the title that was in Stephen B. Allen, which he derived from his brother, Elisha B. Allen. No other title is insisted upon.

Both parties seem to concede that prior to February 25, 1858, John Comstock owned the entire quarter section now in dispute. On that day he conveyed the undivided half of the quarter section to Benjamin F. Allen. Afterwards, on the 3d day of March, 1859, Benjamin F. Allen, his wife, Mary, not joining with him, conveyed this quarter section, with other lands, to his son, Elisha B. Allen. This deed was recorded April 14, 1862. Prior to that date,—that is, on the 15th day of October, 1859,—John Comstock had conveyed the other undivided one-half of the quarter section to Andrew Crawford. This latter deed was recorded August 16, 1861, which was before the recording of Benjamin F. Allen's deed to his son, Elisha B. Allen. In May, 1862, by virtue of an execution issued on a transcript judgment in favor of Owen Conlin, against Elisha B. Allen, the interest of defendant in execution, in the land, was levied upon and sold to the plaintiff in execution, for $318. There was no redemption from that sale by any one, and afterwards the sheriff made Alfred Thurman, as the assignee or holder of the certificate of purchase, a deed for the land that had been sold to Conlin. The title to the undivided half of the quarter section that was in Crawford, afterwards, through certain *mesne* conveyances, came to Alfred Thurman. That title he held at the time of his death. Since the death of Alfred Thurman, defendant, Barbara A. Green, purchased from the widow of Benjamin F. Allen, for

the sum of $1000, her dower in this quarter section, and in other lands claimed to have been owned by her late husband, and took a conveyance of the same to herself and her daughter, Florence Green. Subsequently to the making of this latter deed, Barbara A. Green and Florence agreed to a parol partition of the land, in which it was agreed Barbara A. Green should have the quarter section in controversy in this suit, and that Florence Green should have certain lands that had been conveyed to her by Alfred Thurman, and his wife, Barbara A. Green, and in consideration of that agreement Florence relinquished and gave to her mother all her interest and title to the land in dispute. That was in 1875, and since then Barbara A. Green has been in the exclusive possession, and Florence has claimed no interest in this particular parcel of land adverse to her mother, and does not now claim any.

From this statement of the evidence it is apparent the title that was in Comstock, who seems to have been the source of title claimed by both parties, was vested in Alfred Thurman, and since his death, by the parol partition of land made by the heir and the widow, the land in controversy is now the property of Barbara A. Green, unless it shall be held the titles acquired by Alfred Thurman in his lifetime were taken in his name in trust for complainant's remote grantor, Stephen B. Allen. That is really the only question of any moment in the case. Preliminary to the examination of that question it may be necessary to inquire what were the exact relations between Allen and Thurman, — whether they were that of vendor and vendee, or lessor and lessee.

It is assumed in the argument, the relation of lessor and lessee existed, and that as the defendant, Green, came into possession under her husband, she is still a tenant, and can not dispute the lessor's title without first surrendering possession of the premises to him or his grantee. The determination of this question involves a construction of that clause

of the contract between the parties before noticed. It can hardly be said the relation existing between them, during the three years the contract had to run, was other than that of vendor and vendee. Obviously no rent was to be paid during that period, and Thurman occupied the premises as purchaser, and not otherwise. It will be noted the titles bought in by Thurman were so bought during the period the relation of vendor and vendee existed. The vendee is under no obligation to maintain his vendor's title, and there is no policy of law that forbids the vendee in possession to buy in an outstanding title to the premises and assert it against his vendor, otherwise it might be asserted by the owner, or a stranger might buy it, and it would be lost to both. (*Bright's Lessee,* 7 Wheat. 535; *Jackson* v. *Johnson,* 5 Cow. 74.) But what was the relation that existed between the parties after the expiration of the three years in which the vendor had to perfect his title? Was it that of landlord and tenant? If so, how long was that relation to endure? If at all, it might be perpetual, and it seems most unreasonable that the parties in this case were contracting for such a lease. A demise of real property in perpetuity would seem to be equivalent to an absolute conveyance, and is perhaps so regarded in law. That clause of the contract which is said to create the relation of landlord and tenant, provides in case of the failure of Allen to make the deed as stipulated in the agreement, then Thurman was to pay him "a reasonable rent for said premises so long as he can hold peaceable possession of the same." Does this mean after the expiration of the three years allowed for the making of the deed? Surely not. After Thurman had purchased in the outstanding titles as he did, it does not appear, from anything in this record, there was any one who could contest his right of possession, and it might be perpetual in him, his heirs or grantees. If Thurman was, by this agreement, a tenant after the expiration of the three years, then, as before suggested, that might be equivalent to a perpetual

tenancy, for there was none that could dispossess him. Such a construction is unreasonable, and can not be adopted. Read in the light of the evidence and attendant circumstances, as should be done, all this clause of the contract means is, that in case of the failure of the vendor to make the vendee a deed such as his contract obligated him to make, within three years, then the purchaser bound himself to pay a compensation for the possession he enjoyed, denominated "reasonable rent," for such period as he could hold possession during that time. It will be observed nothing was to be paid until after the contract had expired by its own terms, or unless the vendee had been sooner dispossessed by a superior title. Before that could occur, all relations, whether of vendor or vendee, or otherwise, would have ceased. Strictly speaking, the relation of landlord and tenant never did exist, and never could exist, between Allen and Thurman under their written contract. So there is nothing in the relation of the parties, under the contract or otherwise, that would forbid Thurman to yield to a superior title and buy it in, and in that way secure his peace.

Recurring now to the principal question, whether Thurman bought in the outstanding titles to the property for himself, or under an agreement to buy them for Allen, it will be seen the testimony is as to a verbal contract, if any existed. The written contract contains nothing whatever in regard to buying any outstanding titles or removing incumbrances on the property, by Thurman or any one else. The testimony as to the existence of any contract on the part of Thurman, comes mostly from the witness Cooley. There is but little evidence in the record in support of his statements. Several witnesses gave casual conversations with Thurman concerning these matters, but no great importance ought to be attached to such evidence. It is too unreliable to be made the basis of a decree divesting the legal representatives of a party long since dead, of their title to the property. Had he lived he might have

given some explanation to the conversations or admissions given in evidence, or detailed other parts of the same conversations, that would have made his meaning better understood. Most important of all the testimony introduced on this branch of the case, is that given by the witness Cooley. It is to the effect that after the contract between Allen and Thurman had been executed, the parties came to his office, and it was verbally agreed witness was the agent of Allen to perfect the title by getting in any outstanding claim there might be against the property, and for the purpose of paying for the outstanding claims, Thurman was to furnish the money, and receive a credit as for so much money paid on the purchase price of the land. In pursuance of that arrangement, the witness says he conducted the negotiation which resulted in the purchase of the Crawford title, and which was conveyed to Thurman, for which he paid $700. It does not appear the witness had any connection whatever with the buying in of the Conlin title, which was purchased by Thurman and paid for by him, or that he did anything by way of securing a deed to Stephen B. Allen from Elisha B. Allen, then residing in Oregon. But Stephen B. Allen himself, in his deposition, states the only contract between himself and Thurman was the original or written one, and says distinctly, "Thurman did not agree to buy any title for me." He also testifies the witness Cooley told him "there were no claims worth paying attention to; that he spoke of the Comstock title, which he said wasn't worth anything." According to his testimony he was advised by Cooley the Comstock title was "no account," and he added, "Thurman and I never agreed to buy up that title." Treating these witnesses as of the highest respectability and as of equal credibility, it can not be said it proved the existence of even a verbal contract on the part of Thurman to buy in any outstanding titles for the benefit of Allen. In coming to a conclusion it ought to be regarded as a circumstance of great weight, that now that Thurman is dead his version of

what the witness said occurred between the parties can not be obtained. If living, he might corroborate Allen in saying he "didn't agree to buy any title" for him. That would be in harmony with his interest and his subsequent conduct, and it is not unreasonable to presume he would so testify. After the lapse of so many years, and since the death of the party most interested, the testimony to establish a verbal contract to the effect insisted upon, that would unsettle the title to property long after the death of the party in possession, and who claimed in his lifetime to be the absolute owner, ought to be of the most satisfactory character. Conflicting as the testimony is, it does not, satisfactorily at least, prove the existence of such a contract. It was incumbent on complainant to establish the existence of that contract by a clear preponderance of the evidence, and failing to do so, he can have no standing in a court of equity. If it shall be conceded, as must be done under the evidence, that Thurman bought in the Boylin and Conlin titles for himself, as he had a legal right to do, and not for Allen, under a contract to do so, then the title now held by Barbara A. Green seems to be the better title. At least no reason is perceived, either in law or equity, why defendant in possession should be required to surrender to complainant the title she has, whatever it may be, and if complainant is advised he had a better title, he should have tested it in a court of law, where legal titles are properly cognizable, and not in a court of chancery.

Without resting the decision on that ground, there is much force in the argument that Allen has been guilty of such *laches* as would bar any relief, either to him or to his grantees. The written contract between Allen and Thurman was made in 1864, and the latter did not die until 1870. This suit was not brought until 1883. Thurman was in possession of the premises six years before his death, and several years after he had bought in the outstanding titles in his own name, presumably with an intention to hold them adversely to Allen,

and if the latter intended to insist the titles so acquired by Thurman were for his benefit, he should have asserted that claim in the lifetime of Thurman, that he might have better defended than can now be done by his legal representatives. Since the death of Thurman the grantor of the parties now claiming adversely to him had been guilty of *laches* in not asserting claim, if they had any, against his legal representatives. Since then the party in possession, resting under the confident belief she was the owner, has been permitted to buy in the dower interest that incumbered the property, and to make permanent improvements thereon, and it would seem to be inequitable now to permit him or his grantees to assert a claim to the property she has improved by the outlay of her money, under the claim of ownership.

Under no view that can be taken is complainant entitled to relief, and the decree of the circuit court will be reversed as to Barbara A. Green, who is the only one of defendants that now claims any title to the land involved in this suit or who has assigned errors on this record, and as to her the bill will be dismissed.

*Decree reversed.*