18 Ill. App.2d 462 (1958)
152 N.E.2d 627
Illinois Central Railroad Company, Appellant,
v.
Michigan Central Railroad Company, and New York Central Railroad Company, Appellees.
Gen. No. 47,207.
Illinois Appellate Court  First District, First Division.
June 30, 1958.
Supplemental Opinion, September 18, 1958.
Rehearing denied September 18, 1958.
Released for publication September 29, 1958.
*463 *464 *465 *466 *467 John W. Freels, Herbert J. Deany, and Anne G. Carter, all of Chicago (Joseph H. Wright, Charles A. Helsell, Harold Havighurst, and Arvey, Hodes & Mantynband, of counsel) for plaintiff-appellant.
Werner W. Schroeder, Marvin A. Jersild, Richard O. Olson, Theodore W. Schroeder, and James E. Hastings, all of Chicago, for defendants-appellees.
JUSTICE SCHWARTZ delivered the opinion of the court.
This is an appeal from an order dismissing a suit for a declaratory judgment and for an injunction restraining breach of contract.
By an instrument dated January 5, 1894, the Illinois Central Railroad Company (Illinois Company) gave the Michigan Central Railroad Company (Michigan Company) the right to use its general passenger station house and the station grounds adjacent thereto in the City of Chicago jointly with the Illinois Company (and with such other railroad companies as the Illinois Company would permit) for "so long as the said premises shall be used for a general passenger station." For this right the Michigan Company agreed to pay to the Illinois Company an annual rent of $105,000. On January 2, 1930, the Michigan Company leased its entire railroad to The New York Central Railroad Company (New York Company) and on January 30, 1930, the Michigan Company assigned its interest in the contract to the New York Company. On July 7, 1956, the New York Company and the Michigan Company served notice of termination of their "lease" as of midnight January 4, 1957.
On September 18, 1956, the Illinois Company filed its complaint seeking to have the court declare that defendants had no right to terminate the contract; *468 that the court order specific performance thereof and enter a temporary restraining order to maintain the status quo and a permanent injunction to restrain defendants from breaching the contract of January 5, 1894. To this, defendants filed an answer setting forth that the instrument in question was a lease; that a lease must have a certain beginning and a certain ending, otherwise it is considered a lease from year to year or month to month, depending on the rental period and as such this lease was terminated by the notice above referred to; but if defendants' position on this point is not upheld, the contract would be contrary to public policy and void.
The court heard evidence of the circumstances surrounding the execution of the contract, including the historical relationship of the Illinois and the Michigan Companies in the Chicago terminal, of events relevant to contemporaneous construction of the terms of the contract, and of admissions against interest. The court then stated that it was clearly the intention of the parties that the arrangement should last as long as the Illinois Company maintained the premises for a passenger station, but the law requires that a lease have a definite termination; that this lease had none and, pursuant to the case of Stanmeyer v. Davis, 321 Ill. App. 227 (1944), a lease having no termination date must be considered to be a lease from year to year, that being the period on which rental payments were based. Accordingly, the decree declared that the indenture of January 5, 1894 was a lease without a termination date; that the holding of defendants thereunder was a tenancy from year to year, and that the same was terminated by the notice given by defendants. It denied plaintiff's prayer for specific performance, vacated the temporary injunction previously given, denied the prayer for a permanent injunction *469 and, having thus declared the rights of the parties, the complaint was dismissed for want of equity.
The relevant provisions of the contract in question are here summarized:
Recitals  the Illinois Company has constructed a station and laid out station grounds for passenger trains and business; the trains of the Michigan Company enter Chicago upon the Illinois Company's tracks; the Michigan Company wishes to acquire "the right to use" the general passenger station or parts thereof and the station grounds, and the Illinois Company is willing to grant to the Michigan Company a right to the "joint use" thereof with the Illinois Company and with such other railroad companies as may be permitted to participate in the use of said general passenger station and station grounds.
Article 1  the Illinois Company retains control of certain rooms and apartments in the station house and certain parts of the upper floors of the baggage house, while the Michigan Company shall have the exclusive use of an office room in or adjacent to the building for its general baggage agent and its trainmaster and an operator from time to time. (No specific space was assigned to the Michigan Company.)
Article 2  refers to the consideration as "rents hereinafter reserved to be paid by the [Michigan Company,]" and that the Illinois Company has "granted, demised and leased, and by these presents doth grant, demise and lease unto the [Michigan Company] ... the right to the joint use" of the premises in question "so long as the said premises shall continue to be used for a general passenger station." There follows, in the same article, a proviso that nothing therein contained shall prohibit the Illinois Company from permitting other railroad companies to participate in the joint use of the station and grounds, so *470 long as the Michigan Company shall not be deprived of or unreasonably restricted in its requirements for its own passenger trains and business.
Article 3  the Illinois Company retains the general control, management and regulation of the premises.
Article 4  it shall be the duty of the Illinois Company to keep the premises used in good order and condition.
Article 9  the Michigan Company accepts the grants made to it and agrees that it will make use of the rights and privileges thereby granted and will continue to use the same "so long as the said premises shall be used for a general passenger station; and that for the right to use the said premises jointly, as herein provided, it will pay to the [Illinois Company] an annual rent of one hundred and five thousand dollars...."
Article 10  provides that in case the yard for storing and cleaning passenger cars shall be enlarged or an additional yard provided, valuation shall be made of the additional land, to which shall be added the cost of the improvement. Annual interest on the whole amount computed at 6% shall be the basis for an additional rent charge, and the Michigan Company shall pay to the Illinois Company such proportion of said annual interest as shall be just and equitable. If the parties fail to agree, the matter shall be arbitrated as provided in the agreement.
Article 11  provides for the making of additional improvements on the station grounds and for the making of changes or alterations in those already provided, the Michigan Company to pay to the Illinois Company the same proportionate part of the annual interest on the cost of said improvements or changes computed at 6% as it is required to pay under Article 10.
*471 Article 12  provides that the Michigan Company shall pay its proportion of the cost of ordinary current repairs of the facilities, including salaries and wages of station master, baggage master, assistants and employees, cost of lighting and heating, insurance, taxes (except charter tax) and moneys paid and liabilities incurred for loss of property or injuries to persons, and various other items of operation and maintenance.
Article 13  provides that the expense of maintaining and keeping storage and cleaning yards and of cleaning the cars, including wages of car cleaners and other employees, shall be charged to current account of expenses, and that the Michigan Company shall pay its proportionate part.
Article 14  relates to keeping of accounts.
Article 15  relates to damages to persons or property.
Article 16  relates to apportionment of certain special costs.
Article 17  the Michigan Company shall not assign the contract or underlet the same.
Article 19  in the event of default in the performance of its obligations under the contract, and such default shall continue for 90 days after demand for performance, the rights or privileges granted shall "at the election of the Illinois Company, but not otherwise, at once cease and determine" and the Michigan Company shall yield up possession.
Article 20  provides for arbitration of disputes.
The events which led to the making of the agreement and subsequent events throw considerable light on the issues in dispute. In 1852 the Michigan Company, having no right of way in the City of Chicago, entered the city under a contract by which the Illinois Company granted it joint operating rights over the Illinois *472 Company's tracks from Calumet (now Kensington) to a point north of Randolph Street. From that time until the entry of the order appealed from, the Michigan Company and its assignee, the New York Company, have continuously used the tracks of the Illinois Company from Calumet north, for both passenger and freight business. Prior to 1892 a jointly owned passenger station was located north of Randolph Street. This station having become inadequate, the two railroads gave consideration to forming an independent company to build a new station and to the possibility of the station being jointly constructed and jointly owned by the parties themselves on the old site. However, in 1892 and 1893, after much negotiation, the new station was constructed by the Illinois Company on its land at Twelfth Street, without capital investment by the Michigan Company, and the contract of January 5, 1894, was entered into. It is established beyond doubt that both parties gave long and careful consideration to the construction of this station; that the station was built to accommodate both railroads; and that both intended that the arrangement created would last as long as the premises were used as a general passenger station. This is shown by minutes of meetings of directors and by correspondence between the presidents of the two companies wherein, among other things, the Michigan Company expressed concern that its rights for the future should be defined.
But even if the many documents showing the intention of the parties were not in evidence, the essential facts make it incontrovertible that this station was the product of joint negotiations and was intended and built for permanent usage by both railroads. The Chicago terminal was a very important terminal for both railroads. Of thirty-nine trains using the station in January 1894, eighteen were trains of the Michigan Company, seventeen of the Illinois Company, and four *473 of a third company. During the period in which the Michigan Company used the terminal and its facilities, the volume of business greatly increased; the number of cars per train increased; changes were introduced in railroading and in technological development; and electricity replaced other fuel. These changes and improvements amounted to over $4,000,000. The Michigan Company approved the changes and they were added to the valuation on the capital account on which the Michigan Company paid interest, pursuant to the terms of the agreement, in addition to the annual payment before referred to.
The first question which presents itself for our consideration is whether this instrument is a lease, subject to the rule that it must have a date certain for termination, as stated in Say v. Smith, 1 Plow. Rep. 268 (1564) and applied specifically in one Illinois case, Stanmeyer v. Davis, 321 Ill. App. 227 (1944). It is argued that it is a lease because it uses words denoting a lease. It should first be observed that while the contract uses the word "lease" as a verb, it is nowhere designated as a lease nor does it designate the parties as "lessor" and "lessee." The use of the verb "lease" is not the same as an express characterization of the instrument as a lease. It uses the words "rent" and "let" and the phrases "hath granted, demised and leased," and "yield up undisturbed and peaceable possession." On the other hand, it uses the phrases "wishes to acquire the right to use," "grant of right of joint use in common with the Illinois Company and others," "rights and privileges" and other similar phrases, indicating that the instrument in question is something other than a lease.
[1-3] However, even if we assume that the parties called the contract a lease or that it contains words common to leases, that denomination would not be binding upon us. It is well established that the legal *474 effect given an instrument is not to be determined by the label it bears or the technical terms it contains. It is the intention of the parties that will be given effect. If the implications and incidents of the writing and of the obligations which the parties assume are incompatible with the nomenclature used to describe the instrument or with the terms contained in a contract, the legal provisions of the contract will be given effect. In other words, if by calling this contract a contract or an agreement for the use of trackage and terminal facilities and not a lease, the obligations of the parties thereby become legal, we will consider it to be such a contract or agreement and not a lease. Bonde v. Weber, 6 Ill.2d 365, 377 (1955); Vermont Marble Co. v. Bayne, 356 Ill. 127, 133 (1934); Calame v. Paisley, 296 Ill. 618, 622 (1921); Geithman v. Eichler, 265 Ill. 579, 585 (1914); Consolidated Coal Co. v. Peers, 150 Ill. 344, 348 (1894). In Bonde v. Weber, supra, the court said, p. 377:
"It is too well established to require citation of authority that the legal effect to be given an instrument is not to be determined by the label which it bears or the technical terms it contains."
In Union Pac. Ry. Co. v. Chicago, R.I. & P. Ry., 163 U.S. 564, 582-583 (1896), an instrument in which it was provided that the Union Pacific Ry. Co. "lets the Rock Island Company into the full, equal and joint possession and use of its main and passing tracks" was under construction. The court referred to the fact that in several places in the instrument it was called a lease and the parties were called "lessor" and "lessee," while in the record of the proceedings of the executive committee of the Union Pacific Ry. it was called an agreement "granting trackage rights," and said that what the agreement was styled by the parties does not determine its character or other legal relations. *475 The court held it to be a contract for "running arrangements."
[4] But if we were to consider that the agreement was ambiguous, then the construction which the parties themselves have placed upon it will be followed by the courts. Abingdon Bank & Trust Co. v. Bulkeley, 390 Ill. 582, 596 (1945); Pioneer Ins. Co. v. Alliance Ins. Co., 374 Ill. 576, 590 (1940); Chicago Daily News v. Kohler, 360 Ill. 351, 364 (1935); Vermont Marble Co. v. Bayne, 356 Ill. 127, 134 (1934); Lehman v. Revell, 354 Ill. 262, 284 (1933); Wright v. Loring, 351 Ill. 584, 589 (1933); Wurn v. Berkson, 309 Ill. 520, 522, 523 (1923); Sholl Bros. v. Peoria & P.U. Ry. Co., 276 Ill. 267, 272 (1916); Geithman v. Eichler, 265 Ill. 579, 585 (1914); Slack v. Knox, 213 Ill. 190, 195 (1904).
In the more than sixty years which have elapsed since the execution of the instrument in question, none of the parties to this proceeding, in their considerable correspondence and dealings with one another concerning that instrument, has referred to it as a lease or indicated by their conduct that they considered it to be a lease until July 7, 1956, when the notice of termination was served on plaintiff. In a contract of June 22, 1894, between the Illinois Company and the Michigan Company concerning the care of passenger cars, the instrument in question is referred to as a "station contract." In the lease dated January 2, 1930, by which the entire railroad of the Michigan Company was leased to the New York Company, the property leased was classified as: "1. Owned Railroad Properties," "2. Leased Railroad Properties," and "3. Enumerated Trackage Rights and Easements." The contract in question here is classified not as a lease but under "3. Enumerated Trackage Rights and Easements."
The assignment of January 30, 1930, by which the Michigan Company assigned the contract in question *476 to the New York Company refers to it as the "Agreement of January 5, 1894," and as the "contract." It recites the "lease" to the New York Company of the entire railroad of the Michigan Company, and the desire of the Michigan Company to assign "its interest in said contract of January 5, 1894 ... as an incident to the lease or transfer of said railroad of the Michigan Company to the New York Company."
In 1935 a dispute arose because the New York Company ceased to operate two Michigan Company trains from the Twelfth Street station and began operating them from its LaSalle Street station. An arbitration agreement dated January 4, 1938, recites the consent by the Illinois Company that the Michigan Company "might assign its interest in said agreement of January 5, 1894, to the New York Company in connection with the lease or transfer of the railroad of the Michigan Company to the New York Company." The agreed statement of facts attached to the arbitration agreement refers to "the agreement dated January 5, 1894"; recites the fact that the entire Michigan Company railroad was "leased" to the New York Company, stating that "In connection with the lease," the Illinois Company consented that the "Michigan Company might assign its interest in said agreement of January 5, 1894, to the New York Company"; and refers to an attached map showing the Twelfth Street facilities, "the use of part of which was granted to the Michigan Company by the agreement of January 5, 1894."
Besides the contracts and leases which were introduced in evidence, the record contains many letters between the parties to this proceeding concerning the instrument in question and the arrangement established by it. In these, too, the 1894 instrument is referred to as a contract or agreement, and never as a lease. As late as May 18, 1956, the general manager of the New York Company, in a letter to a vice-president *477 of the Illinois Company, referred to the instrument as "the agreement of January 5, 1894, whereby we secured the right to use certain of your facilities in the accommodating of our passenger trains arriving and departing from Chicago, Illinois."
Even though it is clear that the parties to this proceeding did not consider the instrument a lease, we still must consider whether in the eyes of the law it is a lease. A lease is defined in Black's Law Dictionary, 4th Ed., p. 1035 (1951), as:
"Contract for exclusive possession of lands or tenements for determinate period."
In Cyclopedic Law Dictionary, p. 594 (1922), it is defined as:
"A contract by which a person owning or controlling lands or tenements permits another to occupy the same for a period less than that to which the right of the lessor extends. The person so permitting the occupation of premises is called the `lessor'; the person contracting for possession is called the `lessee.'"
Webster's International Dictionary, 2nd Ed., p. 1408 (1957), defines a lease as:
"A contract by which one conveys lands, tenements, or hereditaments for life, for a term of years, or at will, or for any less interest than that of the lessor, usually for a specified rent or compensation...."
In 51 C.J.S. 502, 512, it is held that among the requisites necessary to establish the relation of landlord and tenant or lessor and lessee, "the possession and control or the right thereto of the demised premises must pass to the tenant...." However, this is qualified to some extent in that there may be a reservation of a right to possession by the landlord for purposes not inconsistent with the privileges granted to the tenant. A case cited in support of this principle and also cited by defendants is Morrill v. Mackman, 24 Mich. 279, *478 284; 9 Am. Rep. 124, 128 (1872). That case involved exclusive possession for the purpose of flowing the land, and the court expressly so stated.
Defendants have cited other cases for the proposition that possession under a lease need not be exclusive in the lessee. Several are cases in which the instrument in question was admittedly a lease or in which the court gave virtually no consideration to the adequacy of the possession. For example, in Nunan v. Dudley Properties, Inc., 325 Mass. 551, 91 N.E.2d 840 (1950), the question was merely whether the lessor or lessee was liable for an injury sustained on the steps of premises which admittedly were subject to a lease, and it was only in regard to this question that the matter of possession was discussed. Universal Vending Service Co. v. DeMeo, 231 Ill. App. 30 (1923), involved an action of forcible entry and detainer. The court expressly stated that whether the instrument under consideration was a lease or a license (the only two contentions made), the result would be the same. It did not go into the question of adequacy of possession to sustain a leasehold, except to say that while the lessor had the right under the agreement there being considered to designate the place to be occupied by the lessee, the actual space occupied by him for a newsstand and concession had been the same during the almost four years of the lease's existence. The facts stated indicate that the lessee's possession was exclusive. Louisville & N.R. Co. v. Illinois Cent. R. Co., 174 Ill. 448 (1898), involved an agreement whereby a railroad corporation was granted the right to build its track across the track and right-of-way of another such corporation. The question presented to the court was whether certain covenants contained in the agreement ran with the land. The court's opinion does not indicate that there was presented any serious contention that the agreement was something other than a lease. *479 It would appear from the opinion that the lessee did in fact have exclusive possession.
Other cases cited by defendants involve arrangements under which the lessee had exclusive possession of all or a primary part of the subject premises or the exclusive right to a particular use of the premises. In Beckett v. City of Paris Drygoods Co., 14 Cal.2d 633, 96 P.2d 122 (1939), the court was presented with a lease versus license question involving a written agreement whereby the plaintiff, an optometrist, was given space in the defendant's large store to conduct an optical department. The defendant contended that the agreement could not be a lease for the reason that defendant was given control of the plaintiff's business matters of advertising policy and the keeping of accounts. By the terms of the agreement the plaintiff was also obligated to discharge any employees who should "become objectionable" to the store. The court held that this was a lease. There is nothing in the opinion to indicate that the plaintiff, although his operation was subject to certain regulations by the defendant, did not have exclusive possession of the area occupied. It is obvious, for instance, that the plaintiff-lessee in that case could not be made by the defendant-lessor to share the leased area with some one else. A similar case cited by defendants is In re Owl Drug Co., 12 F. Supp. 439, 442 (D.C.D. Nev., 1935), where a claimant in a bankruptcy proceeding had leased to the bankrupt certain space in the claimant's large store for the purpose of conducting a toilet goods department and additional space to conduct a cut-rate drug department. The agreement was held to be a lease and not a license, even though the lessor "exercised certain supervisory powers ... made necessary by the nature of the arrangement," and although the location could be changed by the lessor upon 30 days' notice to the lessee. The court stated *480 that "subject to this right of change, or rather substitution, of situs, the right of occupancy of the lessee was absolute against the whole world, including the lessor, so long as he paid the rent and complied with the other conditions of the instrument."
In these and other cases cited by defendants there appears to have been exclusive possession in the tenant, either of the entire premises covered by the lease or of a primary part. Sometimes the tenant's possession extended only to a particular use of the land, but in that use the tenant's possessory rights "were absolute against the whole world, including the lessor." This is sufficient, although the tenant's possession, as is almost always true, was subject to certain restrictions, controls or reservations by the lessor. This does not mean that the lessor shared possession with the lessee. It should also be noted that in many of the cases the matter has turned upon the question of whether the instruments were leases or licenses. If it was a lease, then the term for which the grant was made would be valid, but if a license, it was terminable at will. In holding that they were leases, the courts in most instances were giving effect to the agreement of the parties with respect to the duration of the lease. We have discussed these cases for the purpose of showing how different is the relationship of the parties and the status of defendants in the instant case.
Defendants' possession under the instrument in question is substantially different. The instrument does not set aside any specific area for the Michigan Company. The Illinois Company has complete control and management of the station and station grounds. It appoints the station master who regulates the entrance and exit of all trains. No particular tracks are designated for use by the Michigan Company. The Illinois Company appoints the general baggage master and the necessary assistants. It maintains the tracks, *481 may change location, arrangement and position of the railroad tracks, crossings, switches and connections, and may make improvements and additions thereto as it deems desirable, provided the rights of the Michigan Company shall not be materially impaired thereby. The make-up and handling of defendants' trains as far south as Kensington is under control of the Illinois Company. The actual work with respect to the maintenance of all equipment is under control of the Illinois Company, although defendants have a general supervisor at Twelfth Street. It appears that a certain room had been set aside for the Michigan Company's yardmaster. It also appears that for the convenience of the public, a pattern was ordinarily followed of having the various railroads use certain tracks, platforms and locations for certain purposes, such as loading and unloading, so that the mail and express haulers and other persons involved would know where to go from day to day. This does not constitute the requisite possession for a lease.
Defendants rely heavily on the case of Chicago & A.R. Co. v. Peoria & P.U. Ry. Co., 250 Ill. 320, 324 (1911), as establishing the instrument in question here to be a lease. The terminal arrangement is quite similar. The issue involved, however, was totally different. There, the court was concerned only with who was responsible for the loss of certain merchandise standing at the terminal in one of the cars of the Chicago & A.R. Co. The Peoria & P.U. Ry. Co. claimed that it had performed its whole duty when it set the cars for unloading. The Chicago & A. contended that after the cars were placed for unloading, the Peoria & P.U. was still bound to exercise care to prevent loss. The Supreme Court held with the Peoria & P.U. In the course of arriving at its decision the court did say (p. 324):
*482 "In the contract between the parties the appellee is referred to as a lessee. In fact, it is a lessee. It has the right to the possession and use of the tracks and property mentioned in the contract as complete, though not so extensive, as that of the appellant, who owns them."
In thus construing the document in question the court did not have before it the proposition advanced in the instant case, that is, that calling the document a lease had the result of invalidating one of its vital provisions. For their purpose in that case it was sufficient to have established that when the Peoria & P.U. had performed its railroad function of spotting the cars at the place where they were to be loaded, it had performed its duty and from there on the cars were in the possession of the Chicago & A. No careful study as to whether that contract should be considered a lease or an agreement for joint facilities was made.
[5, 6] Defendants have emphasized a statement made by the court in Chicago & A.R. Co. v. Peoria & P.U. Ry. Co., supra, that whenever any part of the Peoria & P.U.'s track was occupied by the Chicago & A.'s cars, the possession was for the time being exclusive. As mentioned before, the issue there involved possession and control of particular cars, and no more. This, perhaps, accounts for the language used by the court. As is shown by the many cases cited by defendants themselves, a leasehold requires that the lessee's possession be more than merely coextensive with the lessor; it must be exclusive against the world and the lessor. Moreover, the opinion does not discuss the provisions of the contract or the language used nor does it discuss the circumstances surrounding its execution or its construction by the parties. In fact, the court does not discuss the intention of the parties to the contract. But if the intention of the parties to an agreement is controlling, as we have before stated, *483 each case must depend upon such intention, as it is ascertained from a consideration of all of the contract and its surrounding circumstances. The Supreme Court has stated that its decisions construing contracts and wills are not controlling unless the language of the contract or the circumstances surrounding the parties are substantially the same. See Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 258 (1931); Smith v. Garber, 286 Ill. 67, 72 (1918); Walker v. Walker, 283 Ill. 11, 19 (1918).
[7, 8] It is argued that if defendants had defaulted, plaintiff would have been able to oust them by a forcible entry and detainer action and that this indicates that the relationship between plaintiff and defendants was one of landlord and tenant. The forcible entry and detainer act does not confine the remedy it provides to a landlord-tenant relationship. It provides a remedy whenever peaceable entry is made and possession unlawfully withheld. Ill. Rev. Stat. (1957) Ch. 57, Sec. 2 (2); Thomasson v. Wilson, 146 Ill. 384, 392 (1893); Winitt v. Winitt, 339 Ill. App. 75, 78 (1949). It may be used to oust a party wrongfully withholding possession under a contract. See, for example, Sullivan v. Culp, 260 Ill. App. 443, 446 (1931); Crain v. Burnett, 190 Ill. App. 407, 411 (1914). It is difficult, however, to imagine any situation in which a forcible entry and detainer suit would have been used in a controversy arising out of this contract. Plaintiff was in control and management of the terminal, and trains of defendants as they entered the terminal were subject to orders and directions of plaintiff's agents. It is not conceivable that defendants would have operated trains on plaintiff's tracks against its orders. All that plaintiff need have done to have made use of the terminal impossible for defendants would have been to deny them the supervisory and other services required for operation of the terminal. This would compel them *484 to resort to equity for specific performance (or, in the alternative, damages) as plaintiff has done in this case.
[9] A lease is essentially a type of contract. If an instrument has many provisions not ordinarily found in leases, one of which would be held invalid if the instrument were called a lease, but valid as a contract, it appears to us that the law would be futile and foolish if it required that the instrument be denominated a lease and thereby defeat the clear intention of the parties. The dominant character of the instrument in question is plaintiff's agreement to provide and defendants' agreement to use facilities of an extensive character, together with a multitude of supervisory and other services to be performed by plaintiff. Such a contract has little, if anything, in common with what was called a lease in Say v. Smith, supra, and the cases which have followed the rule laid down therein.
[10] If we were to conclude that it should be called a lease, would we be bound thereby to apply the rule laid down in Say v. Smith, 1 Plow. Rep. 269, and followed in one Illinois case? In Stanmeyer v. Davis, 321 Ill. App. 227 (1944) (leave to appeal denied 326 Ill. App. xiii (1945)) the defendants were in the automobile business, and the claim was that the plaintiffs had made an oral lease of the premises "for the duration of the war and until automobiles are again produced" and "until defendant receives twenty-five automobiles in any one month." The court stated the issue thus, p. 229:
"The question to be determined is whether a verbal leasing of the premises `for the duration of the war and until automobiles are again produced' and `until defendant receives twenty-five automobiles in any one month' creates a leasehold estate for a term of years, or whether it is void for uncertainty of the term and, therefore, gives only an estate at will."
*485 The court referred to Say v. Smith, supra, decided in 1564, in the sixth year of the reign of Elizabeth, and then to Blackstone, who said:
"For every such estate must have a certain beginning and a certain end. But id certum est, quod certum reddi potest (that is certain which can be made certain)." (Cooley's Blackstone, 4th Ed., p. 546.)
It is urged that the Supreme Court, having denied leave to appeal in Stanmeyer v. Davis, supra, has established stare decisis on this principle in Illinois. All courts, and more especially a court of intermediate review, must not only decide the particular case before it, but do so on the principles and rules established by prior authority for the guidance of men in their relations with each other. Otherwise judges become no more than arbitrators rendering fireside equity.
[11] However, the principle in question cannot be considered to have had the approval of the Supreme Court because that court in denying leave to appeal approves the result reached but not the reasons which led thereto. (Walters v. Walters, 409 Ill. 298, 305 (1951).) Therefore, denial of the leave to appeal did not necessarily mean that the Supreme Court approved the application of the lease rule. It could well have approved the result on the ground set forth in the opinion of the Appellate Court, that the particular contingencies terminating the lease were too many and too uncertain. The oral lease was "for duration of the war and until automobiles are again produced" and "until defendant [the lessee an automobile dealer] receives twenty-five automobiles in any one month." While the court held that this did not create a lease because of the uncertainty of the date of termination, it took pains to indicate that the decision might have been different if a single, clear-cut contingency had been involved rather than a multiplicity of contingencies *486 which individually presented problems of ascertainment.
The rule in Stanmeyer v. Davis arises out of a past now so remote, it is difficult for us to understand the reasons which gave it birth. In the one hundred and twenty-five years or more of the legal history of this state, it is the only case which can be found in which the rule was specifically applied. As we have pointed out, that case concerned an arrangement which was unquestionably a lease in the strict technical sense and involved other questions which may well have formed the basis of the court's decision. At the time the rule was adopted in Say v. Smith, supra, the court gave no reason for it, although it said that a lease for one hundred years would be valid. As a matter of fact there was no restriction on time. In the year 1564 it was not the intention of the parties that counted in the making of a contract, lease or deed. It was the words used. "Legal interpretation was taxonomic, like Latin names for flowers." "That lawyer's paradise," Thayer called it, "where all words have a fixed, precisely ascertained meaning." (Thayer's Preliminary Treatise, p. 428.) (See Jurisprudence in Action, A Better Theory of Legal Interpretation, by Charles P. Curtis.)
Our society has become infinitely more complex since the day of Say v. Smith. Industrial and commercial relationships especially require subtle and intricate expression not to be embraced adequately in a single word provided by the scrivener's art. Legal taxonomy, while still of substantial utility for some purposes, is not the sacred cow it once was. Thus it is common for parties to designate as leases, agreements which the lawyers of even a century ago would be unable to recognize as such. The Supreme Court of the United States considers a long term lease no more than a method of transferring real estate without *487 requiring the purchaser to pay the whole purchase price. In Palmer v. Connecticut Railway & Lighting Co., 311 U.S. 544 (1940), where proof of damages for breach of a 999 year lease was involved, the court said, p. 555:
"Litigation over a 999-year lease naturally brings up incidents difficult to reconcile with known and established legal formulae. Since conveyancers and business men alike have long utilized the characteristic provisions of leases to accomplish transfers of rights in real estate for extensive periods without payment of the purchase price, such long term agreements have become a well recognized legal implement, especially in corporate realty transactions and railroad consolidations and mergers."
The court found no reason to disagree with the Circuit Court of Appeals that under the evidence presented, damages for eleven years should be allowed. It is made quite clear in this discussion of long term leases that they are fully as uncertain as to time of termination as would be a lease terminable as in the instant case. We can well ask, what point can there be to any rule which holds that a lease for the life of a building is invalid, while one for 999 or 2000 years is valid? That the latter will never live out its term but will be terminated by some unforeseen circumstances is as certain as anything can be in this uncertain world. The period provided for in the instant case is a far more reasonable compliance with the requirement of certainty.
Where the courts of another day adhered rigidly to a prescribed meaning for the word used, we have learned to ask: "What was the intention?" "What is involved?" "What is its purpose?" "What is reasonable?" This court recently had occasion to state that certain agreements covering a transaction in lift *488 trucks, referred to by the parties as "sale-lease" or "lease-purchase" agreements, in which the parties are referred to as "lessor" and "lessee" and under which monthly payments were characterized as "rent," are in legal effect, conditional sales contracts. Arco Bag Co., Inc. v. Facings, Inc., 18 Ill. App.2d 110, filed June 9, 1958, Illinois Appellate Court, First Division, First District.
While the reason stated for the rule in Stanmeyer v. Davis is questionable in itself, it is more questionable when considered in the light of the fact that, as applied by the courts, the rule is that the maximum termination date must be certain, since the authorities almost universally sustain a lease for a term of years where the termination date is certain, although the lease, by its provisions, may terminate earlier upon the occurrence of a particular contingency. In other words, all the parties in the instant case need have done was to have drafted a lease for a term of, say, 2000 years, subject to termination when the premises "shall cease to be used for a general passenger station." 51 C.J.S. 534; 24 I.L.P. 303; 1 Restatement, Property (1936) sec. 19, comment c; 1 Tiffany, Landlord and Tenant, sec. 19d (1912). See Adelman v. Carson, Pirie, Scott & Co., 247 Ill. App. 574 (1928). In Great Northern Ry. Co. v. Arnold, 33 T.L.R. 114 (1916), the court was concerned with a lease for the duration of the war. Reasoning that the parties could have achieved the desired result by providing for a long term, say for 999 years, determinable at the end of the war, the court ruled that the lease was valid for a term of years. That case, although overruled in the subsequent case of Lace v. Chandler, 1 All England Law Reports Ann., 305, 306 (1944), seems to us to represent the more enlightened view. This view is expressed in Vol. 1, American Law of Property, sec. 3.14, where, immediately prior to pointing *489 out that there is no limitation on the duration of an estate for years in the absence of statute and that terms of 2000 years have been held valid, it is stated that the rule we are here concerned with (citing, among other cases, Stanmeyer v. Davis), "is open to criticism" and continues as follows (pp. 209, 210):
"Illustrative of the problem are a number of decisions involving leases for the duration of a particular war. Although there are cases to the contrary, the tendency has been to uphold such leases in accordance with the intention of the parties. In doing so, the courts usually have referred to the lease as a contract and stated that it is not too uncertain to be enforced. In the absence of conflict with statutes limiting the duration of leases there appears to be no good reason for thwarting the expressed intention of the parties in such situations."
In view of the fact that the law sustains so many other estates which are subject to contingent limitations, including an estate for a certain number of years terminable earlier upon the happening of a contingency, we see no reason for perpetuating a needless, pointless inconsistency in situations of the type we are dealing with here.
This brings us to a consideration of other Illinois cases cited by defendants. In Easton v. Mitchell, 21 Ill. App. 189 (1886), there was a lease "during and for the whole time that he [lessee] may be postmaster for said town of Charleston." At the time of the execution of the lease, the lessee had a four year commission as postmaster of Charleston. It was clear, therefore, that for this four year period the term was certain. The question presented to the court was the nature of the tenancy after the expiration of the lessee's first term as postmaster, upon his reappointment for a second four year term. It is true, as pointed out by defendants, *490 that the court there stated that every estate for years must have a certain beginning and a certain end, but the court expressly found that the lease had expired by its own limitation at the termination of the lessee's first term as postmaster, and it consequently was not required to decide the legal ramifications of an uncertain term.
Another case cited by defendants is Green v. Dietrich, 114 Ill. 636 (1885). In that case Thurman and Allen entered into a contract whereby Thurman was to pay Allen $3500 in three years, provided that within that time Allen had given Thurman a perfect title to the premises there involved. Although Allen delivered possession to Thurman, he never had title to the premises. Thurman, however, subsequently acquired title from a third party. The court pointed out that the "only question of any moment in the case" was whether Thurman, when he acquired title from the third party, took it in his name in trust for Allen. The contract between Thurman and Allen had provided that the former was to pay the latter "a reasonable rent for said premises so long as he can hold peaceable possession of the same." The court said that this provision referred only to the three-year period and not to any subsequent possession. The case clearly is not authority for the proposition here urged by defendants.
Idalia Realty & Development Co. v. Norman, 232 Mo. 663, 135 S.W. 47 (1911), cited by defendants, involved an ejectment proceeding in which the defendant had possession of certain land under an agreement which gave him possession for five years and thereafter "until the mill is removed." The court held that the defendant's tenancy after the expiration of five years was not one for years, since its termination was not definitely fixed nor capable of being made certain, but was a tenancy from year to year. However, the *491 court indicated plainly that in a case such as that now before us it would have decided differently. It said, p. 50:
"If the body of the lease had shown the end of the term by the use of language indicating that the lease was for a definite purpose, and when that purpose was subserved the lease was at an end, as in Conservative Realty Co. v. St. Louis Brewing Association, 133 Mo. App. 261, 113 S.W. 229, cited and relied on by counsel for defendant, we would have a different case to deal with."
In National Bellas Hess, Inc. v. Kalis, 191 F.2d 739 (C.A. 8th, 1951), the court, applying Missouri law, followed Idalia Realty & Development Co. v. Norman, supra. The lease was "for a term commencing October 1, 1943 and ending sixty (60) days after the signing of the treaty of peace upon the close of the war with Germany and/or with Japan, whichever treaty of peace is latest...."
Some cases cited by defendants are cases in which no term at all was provided, such as Hill v. Hunter, 157 S.W. 247 (Court of Civil Appeals of Texas, 1913) where the lease provided that it was only for as long as the lessee paid his rent. However, some cases do sustain defendants' position, and as to them we can only say that not only were the facts different, but we believe their reasoning and conclusions are not sound.
[12] Defendants argue that even if the court did find that this was not a lease subject to the rule laid down in Say v. Smith, supra, the contract is void because it is against public policy for a railroad by contract to control permanently the location of its railroad depot. This doctrine as applied to a case in which two or more railroads have arranged with each other for the use of terminal facilities is one of first impression. The trial court in rendering its decision did not pass upon the question. To support their position *492 defendants have cited cases which fall into two categories  cases in which the paramount issue is public convenience or necessity, instituted or inspired by the inhabitants of a particular community to compel the establishment or continuance of railroad service or station accommodations at a certain location. Chicago & E.I.R. Co. v. People, 222 Ill. 396 (1906); Mobile & Ohio R. Co. v. People, 132 Ill. 559 (1890); People v. Chicago & A.R. Co., 130 Ill. 175 (1889); cases in which the paramount issue is the validity of a railroad's contract with or conveyance of land by individuals, where the contract or conveyance obligates the railroad to establish or continue service or station accommodations at a particular location, or which obligates the railroad not to establish accommodations or service at a particular location. St. Louis, J. & Chi. R. Co. v. Mathers, 71 Ill. 592 (1874); St. Joseph & D.C.R. Co. v. Ryan, 11 Kan. 602, 15 Am. Rep. 357 (1873). None of these cases is applicable to the problem here under consideration. Mobile & O.R. Co. v. People, supra, is the case upon which defendants place their major reliance, but it is inapplicable to the facts in the instant case. The court there said, p. 570:
"... and so we have held that a railway company cannot bind itself, by contract with individuals, to locate and maintain stations at particular points...." (Emphasis ours.)
In the instant case defendants' contract is not "with individuals"; it is with another railroad. Rather than being contrary to public policy for railroads to enter into permanent arrangements of the type we are here concerned with, it is generally considered to be in the interest of the railroads and the public that they be encouraged to do so. The Supreme Court of the United States said in Union Pac. Ry. Co. v. Chicago, R.I. & P. Ry. Co., 163 U.S. 564 (1896), at p. 585:
*493 "`Courts cannot be blind to the fact that every railroad company cannot have entrance to our great cities over tracks of its own, or to the fact that railroad companies do, and every public interest requires that they should, make proper contracts for terminal facilities over the roads of each other.'"
[13] It is well known that almost every large railroad terminal is used by more than one railroad. The most obvious reason is economy. But the public has another important interest in the consolidation of terminal facilities. This lies in the blight and other unfavorable effects which the location of large terminals often works on adjacent and surrounding areas. The legislature of this state has recently taken official cognizance of this problem by enacting the Railroad Terminal Authority Act (Ill. Rev. Stat., [1957], Ch. 114, pars. 361-389). In Section 2 of the Act the legislature has announced its "Declaration of public purpose," which specifies such blight, depressed land values, traffic congestion, and other such defects, as reasons for accomplishing, among other objectives, "the consolidation of railroad terminals and terminal facilities." The Act empowers a Railroad Terminal Authority, a municipal corporation created pursuant to its provisions, to remove existing terminals and terminal facilities upon such terms and conditions as may be agreed upon by the railroad and the Authority. In the recent opinion of the Illinois Supreme Court in People ex rel. Adamowski v. Chicago Railroad Terminal Authority, 14 Ill.2d 230, where the validity of the Act was sustained, the court refers to "the long-term leases which the act seems to contemplate."
In the sixty or more years in which the Twelfth Street arrangement was in effect there has been no governmental action or declaration indicating that permanent terminal contracts violate public policy. To the contrary, the policy of this state has been declared *494 by the legislature to be in substantial conformity with what was accomplished by the Illinois and Michigan Companies in the contract of January 5, 1894, that is, the consolidation of terminal facilities on a long-term basis.
[14] Finally, defendants contend that plaintiff is not entitled to specific performance because money damages provide an adequate remedy and because a court of equity will not decree specific performance of a contract where one of the parties may terminate it at will. On this latter point defendants cite Ulrey v. Keith, 237 Ill. 284, 294 (1908); Watford Oil & Gas Co. v. Shipman, 233 Ill. 9, 13, 14 (1908); 22 A.L.R.2d 533. While defendants' position on this point may have some theoretical substance, it has no realistic value in the instant case. Here we are concerned with the operation of a great railroad terminal built and operated for joint use over a long period of time. In the interpretation and application of its rules, the law cannot be impervious to the many considerations that make specific performance the only practical remedy. It is clear that a suit for damages is not an adequate remedy. Union Pac. Ry. Co. v. Chicago, R.I. & P. Ry. Co., 163 U.S. 564 (1896); Grand Trunk W. Ry. Co. v. Chicago & E.I. Ry. Co., 141 F. 785 (CA 7th, 1905); 58 C.J. 1052, 81 C.J.S. 586, 587. We have heretofore referred to the case of Palmer v. Connecticut Railway & Lighting Co., 311 U.S. 544, where the difficulties of estimating damages for breach of a long term lease are illustrated.
[15] We have also considered the argument made by defendants that the contract is terminable at the will of the Illinois Company and hence should not be specifically enforced. Considering the nature of the contract, the importance of the terminal, and the large investment therein, we see no substance in that argument. Defendants, in our opinion, would have been *495 able to obtain equitable relief by way of injunction or specific performance against an improper termination of the contract by the Illinois Company.
[16] It is our conclusion that the contract of January 5, 1894, is not a lease but a valid contract for the use of joint facilities and for services of a general and supervisory character. But whether lease or contract, it is our opinion that the rule requiring a date certain for termination should not be applied.
The decree of the Circuit Court is reversed and the cause is remanded with directions to enter a decree finding the issues for plaintiff and granting plaintiff the relief prayed for.
Decree reversed and cause remanded with directions.
McCORMICK, P.J. and ROBSON, J., concur.

SUPPLEMENTAL OPINION AND RULING ON PETITION FOR REHEARING
In their petition for rehearing defendants have urged that this court has overlooked the point that the contract in question is an agreement relating to the use of land and improvements; that there are only three categories of agreement permitting the use of land  conveyance, lease and license  and hence the agreement must fall into one of those categories; that it cannot be a conveyance, which "involves a transfer of an interest in land, such as a fee, easement or other freehold interest"; that if it were a license it would be revocable at will; and that therefore it must be a lease. On this dialectic, defendants base their right to terminate the contract as if it were a year to year lease. We thought our opinion had made clear that this was not a sound argument, but we will undertake to restate our conclusions.
*496 Of course, the station and tracks rest on land and the trains run on tracks laid on land. In that respect the document is a contract involving the use of land. But it is far more than that. It gives defendants the use of extensive terminal facilities and provides a multitude of services for them, including management and supervision of the terminal, a station master, baggage master, assistants and employees, car cleaners, repairmen, and many others; in short, all the services and all the property, real, personal and mixed, involved in the conduct of a great railroad terminal. No specific space was assigned to defendants. All their train movements and practically the entire usage of the premises were subject to the immediate direction of plaintiff. A passenger who contracts for transportation sits on a chair in a train which runs on tracks laid on real estate. We have yet to hear of the classification of such an agreement as one permitting the use of land. If it were so, the law defining the duties of passenger and carrier might well be subsumed under titles relating to real estate, such as landlord and tenant, future interests, and so on. We would have to rewrite the law books.
[17] The contract in question has some of the characteristics of a lease, some of the characteristics of a contract for personal services and some of the characteristics of a contract for the use of personal property. Defendants' view is that if any real estate is involved, it must be a lease. A sort of antimiscegenation law is here invoked  the color of a part determines the whole. We do not agree with this view nor do we feel the urge for classification. We have called it by what it is  a contract for the use of terminal facilities.
[18] But assuming the contract in question was a lease, we held we would not apply the rule requiring an absolutely certain termination date, and pointed out that a lease for 999 years or longer is lawful. Defendants in their petition for rehearing say that in a *497 999 year lease the lessee knows the extent of his rights and obligations. In other words, they contend that a 999 year lease is more certain than one for the period provided for in the instant case. It is characteristic of the advocacy of a technical point that it falls into abstractions which divorce the law from reality. We know, with as much certainty as it is given man to know, that no arrangement for the use of a passenger station will last 999 years. It is bound to end on a date far short of that, indeed, at a time utterly unknown. Even the calendar may be changed during a millennium. Yet in defendants' view the mere naming of a date which sounds absolutely certain, but has no certainty, is enough to make one contract valid and another lacking it (but offering a more certain date) invalid.
[19, 20] Defendants urge upon the court that we have ignored the principle of stare decisis because we have not followed Stanmeyer v. Davis, 321 Ill. App. 227. We pointed out in our opinion that there is a vast difference between the facts in that case and those in the instant case, and we believe we have adequately distinguished that case. But even if it were otherwise, we are not convinced by defendants' ardent adherence to the decision in the Stanmeyer case that for a division of this court to depart from a principle set forth in a single prior case is equivalent, let us say, to Erie R. Co. v. Tompkins, 304 U.S. 64 (1938). Reference to any volume of the United States Supreme, Illinois Supreme or Appellate court reports of the past decade reassures us that our decision was not the catastrophic legal event which the petition for rehearing would have it appear. It is said that legal principles continue to live long after they have had their brains bashed out. But when neither reason nor practice requires it, there is no point in preserving an outmoded principle. Defendants say "The law can only be known if fixed and established rules are adhered to consistently. *498 ..." Stanmeyer v. Davis was decided more than fifty years after the contract in question was made. Neither the parties nor their lawyers knew of any such rule. If they had, they certainly would not have entered into the agreement on a year to year basis. That is the kind of rule which is a snare and not a guide.
[21] We will consider one more point made by defendants in the petition for rehearing. Defendants say that our opinion ignores the statement in 51 C.J.S., p. 512, that "The possession of the tenant need not in all cases be complete or exclusive." In our opinion we quoted C.J.S. to the effect that one of the requisites of a lease was that possession and control must pass to the tenant. Immediately following that statement we said that this was qualified to some extent in that there may be a reservation of a right to possession by the landlord for purposes not inconsistent with the privileges granted to the tenant. This we considered to be a fair statement of the law. A re-examination of the authorities confirms our conclusion.
[22] Defendants also say in their petition that we have not given consideration to the fact that they were to have the exclusive use of a convenient office room in or adjacent to the station. Surely, defendants do not expect any court to compress the breadth and scope of this contract into one office room. That would be a Procrustean operation of major proportions. By fair analogy, it would mean that a contract for the employment of a farmhand would be a lease if he were given the exclusive use of an outhouse.
We acknowledge an error in our opinion which defendants have pointed out. We said that "it is argued" that defendants if in default could have been ousted by a forcible detainer suit and therefore the relationship was one of landlord and tenant. We should have *499 said that the trial court stated this was one of the grounds on which he reached his decision.
[23] A petition for rehearing can serve only one constructive purpose, that is, to call the court's attention to matters overlooked which might induce the court to change its decision. This court gives careful consideration to all such petitions and there is no need in order to engage the court's attention to indulge in such extravagances as the headlines "The Supreme Court Overruled," or "Does The Opinion Establish a Freehold Interest in Defendants?" They are not appropriate to a serious legal document. Petitions for rehearing are sometimes used to serve a secondary purpose  to enable counsel to assuage the digestive pains which follow defeat in a hard fought case where stakes are high. This court is comprised of men who have practiced law and experienced such pains. We are not unsympathetic to the use of the petition for its secondary purpose, even though it is not in accord with the rules. However, we have observed that the indignation is often in inverse ratio to the worthiness of the cause.
[24, 25] In the instant case a contract was made in good faith and pursuant thereto millions of dollars were expended upon the understanding clearly expressed that the arrangement should last as long as the premises were used as a general passenger station. Defendants unabashedly proclaim that they now seek to terminate it because they can save a large amount of money by so doing. They say that refusal by this court to call "this lease" a lease "is arbitrarily to deprive defendants of one of the legal rights to which they are entitled under the law of Illinois." Of course, defendants having found the contract burdensome have a right to seek any means of escape within the law and to discover by all the diligence and ability they have whatever technical defense they can and *500 this right they have zealously exercised. But the feeling of inequity and injustice which pervades defendants' petition for rehearing is difficult to reconcile with the realities of their position. There can be no equity in the position of a party who seeks to evade performance of his clearly expressed obligations even though some technicality might permit him to escape therefrom as, for instance, in the days when lack of a seal might be pleaded. The law which holds parties in good faith to their bargain has come down to us from primitive times. Justice has been defined by some legal historians as the "enforcement of covenants." It has never been considered relevant for one of the parties to plead that he has become distressed by reason of the cost of performance. Other remedies have been provided for such situations. David Hume, whose legal philosophy had great influence in the shaping of the principles embodied in our constitutions, federal and state, laid down three fundamental laws, "that of the stability of possession," "of its transference by consent," and "of the performance of promises." He considered that the peace and security of human society depended upon them and that there was no "possibility of establishing a good correspondence among men, where these are neglected." (Hume's A Treatise of Human Nature, p. 526.) Of course, these are only philosophic generalizations and have no effect unless implemented by law. But it is well for those who with rule and line undertake the measure of a court's decision to bear them in mind.
We do not know how many contracts of a similar nature would be imperiled if the court were to hold that such contracts are year to year leases. Nor do we know the effect on the conduct of business generally of a great railroad's successful accomplishment of its determination to abrogate a contract in violation of its unchallenged written obligation on a ground wholly unknown to the parties at the time of the *501 making of the contract and discovered when it was to defendants' interest to seek its abrogation. We have made these comments only to put in its true light the charge in the petition for rehearing that this court has arbitrarily deprived defendants of a right.
Rehearing denied.
McCORMICK, P.J. and ROBSON, J., concur.