URBAN INVESTMENT AND DEVELOPMENT Co. *et al.*, Plaintiffs-Appellants, *v.* MAURICE L. ROTHSCHILD & Co., Defendant-Appellee.

(No. 59061;

First District (2nd Division)—January 10, 1975.

HAYES, J., specially concurring.

Overton, Schwartz & Yacker, Ltd., of Chicago, for appellants.

Sydney B. Wexler, Warren L. Swanson, and David A. Lowe, all of Chicago, for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This appeal is from a judgment entered in two consolidated suits for possession of land filed by the landlords of a tenant to whom they were renting stores in two shopping centers. Notices terminating the tenancies were served on the ground that the tenant's parent corporation had filed bankruptcy proceedings, an occurrence which the landlords claimed was a default that entitled them to demand surrender of the rented premises. The issue presented is whether the landlords had the right to terminate the leases and thus were entitled to possession of the stores. The facts giving rise to this issue are undisputed.

For many years prior to November 4, 1971, Maurice L. Rothschild & Co. was a wholly owned corporate subsidiary of Botany Industries, Inc. Botany was incorporated in Delaware; Rothschild in Illinois. On October 31, 1971, Rothschild executed an "Assignment and Assumption" agreement with Botany which recited that, subject to its right to continue occupying the leased premises, Rothschild "does hereby assign to [Botany] all of its right, title and interest as lessee * * *" in eight leases. In one of these, Rothschild was renting a store in the River Oaks Shopping Center, Calumet City, Illinois, from Draper and Kramer, Incorporated. In another, Rothschild was renting a store in the Old Orchard Shopping Center, Skokie, Illinois, from Urban Investment and Development Co.'s predecessor corporation. The River Oaks lease was to July 31, 1981; the Old Orchard lease, to July 31, 1977. Each lease was nearly identical in form with the other; at Rothschild's election, they could be assigned to its parent corporation; and each contained an article which provided in part that "* * * if any proceedings shall be commenced to declare Tenant bankrupt or insolvent * * * then Landlord may treat the occurrence * * * as a breach of this lease * * *."

On the day the "Assignment and Assumption" was executed, Rothschild and Botany entered into another agreement by which the two stores were "subleased" to Rothschild for a period to end on the same dates that the two leases expired. In this agreement, Botany was denominated the "assignee of and tenant" of the premises with power to terminate in the event it received "a bona fide offer to purchase its position as an assignee-tenant * * *" under the leases. Rothschild had the right of first refusal and was guaranteed a release from all liability if terminations should become effective. By the terms of the latter agreement, Rothschild remained bound to the terms of the two leases; it could look only to the landlords for service; and instead of the amounts called for in each lease, it was to pay Botany as rent a sum equal to 5% of its gross sales in each store, payable monthly. Then, on November 4, 1971, Botany sold all the capital stock of Rothschild to Clarence Permut, subject to the agreements of October 31.

On April 25, 1972, in the United States District Court for the Eastern District of Pennsylvania, Botany filed proceedings for reorganization under chapter XI of the bankruptcy act. Approximately 2 weeks later, the landlords, Draper and Kramer, Incorporated, and Urban Investment and Development Co.'s predecessor, served notices that, as provided in the bankruptcy provisions in each lease, they were electing to terminate and take possession of the two stores, claiming that the filing of bankruptcy proceedings by Botany was a default under the leases. Accord-

ingly, they demanded that Rothschild surrender the leased premises. Rothschild refused to do so. Thereupon the landlords filed separate suits for possession. Each complaint alleged execution of the leases, the later execution of the "Assignment and Assumption" and "Sublease" agreements between Rothschild and Botany, payment of rent by Botany after the agreements,[1] the provision concerning bankruptcy and the filing of bankruptcy reorganization proceedings by Botany. Each complaint alleged that the filing was a violation of the leases and prayed for issuance of a writ of restitution.

Rothschild appeared, answered the complaints and admitted having executed the "Assignment and Assumption" and "Sublease" agreements with Botany; it affirmatively alleged that under the leases and after the agreements, it continued to be the tenant; that all the rents had been paid; that Botany did not, at any time, become a tenant of the leased premises; that Botany had filed for reorganization under the Federal bankruptcy act but this fact did not change Rothschild's status as tenant of the stores because Rothschild was not involved in any bankruptcy proceeding; and that Rothschild was prepared to continue performing all the obligations it had undertaken under the terms of the two leases. Then, the parties proceeded with discovery and with motions for summary relief.[2] In the interim, on November 30, 1972, without Rothschild being a party, Botany, in the bankruptcy case, entered into a surrender agreement whereby it agreed to termination of the leases.

A short time later, the trial court entered an order consolidating the two suits filed in the circuit court of Cook County. Following this entry, the trial court, having heard the parties, found that Rothschild had executed an "Assignment and Assumption" agreement with Botany, as assignee; that by the terms of the leases, Rothschild, not Botany, was the tenant; that Botany had filed for reorganization under chapter XI of the bankruptcy act but Rothschild was not involved in any bankruptcy

---

[1] During the pendency of the suits, the landlords refused to accept rent from Rothschild on two occasions, June 6, 1972, and June 26, 1972. On November 30, 1972, however, they indicated a willingness to accept rent for the months of May thru December 1972. On December 8, 1972, the landlords again refused to accept rent from Rothschild as tenant. On that day, the trial judge ordered the rent paid into an escrow account; and after judgment was entered for Rothschild, the accumulated rents were paid to the landlords.

[2] Prior to the trial of the case, the Almalgamated Clothing Workers of America, Chicago Joint Board, a union that represented Rothschild's employees, was permitted, on its motion, to appear *amicus curiae* and submit an affidavit in support of Rothschild's opposition to the landlord's efforts to evict it from the two stores. The union is not a party to this appeal.

proceeding; that the provisions in the leases concerning the occurrence of bankruptcy had not become operative; and that with regard to the payment of rent, its noncollection by the landlords was the result of the strategy by which they refused an open-court tender of payment by Rothschild. The trial court concluded that the notices of termination were invalid and that the landlords were not entitled to possession. It is this ruling that gives rise to the issue presented for our review. To resolve the issue, we must first determine the effect of the "Assignment and Assumption" and "Sublease" agreements between Rothschild and Botany and then decide who was the tenant of the two stores on April 25, 1972, when Botany filed the bankruptcy reorganization proceedings.

## I.

Throughout this litigation, Rothschild has contended that the "Assignment and Assumption" and "Sublease" agreements it entered into with Botany did not affect its status as the tenant under the leases in question. The landlords, on the other hand, contend that the agreements, together with the sale of Rothschild to Permut, were intended by the parties to make Botany the tenant of the stores as the assignee of the two leases. No findings of fact or conclusions of law concerning these agreements were made or reached by the trial court. It is our opinion, however, that the court construed them *sub silentio* when it ruled in favor of Rothschild. The essential question in that construction was whether the leases were assigned to Botany.

■■ A lease is a contract for exclusive possession of lands, tenements or hereditaments for life, for a term of years, or at will, or for any interest less than that of the lessor, usually for a specified rent or compensation. (*Illinois Central R.R. Co. v. Michigan Central R.R. Co.*, 18 Ill.App.2d 462, 477, 152 N.E.2d 627.) A lease possesses the property of passing an estate in land; it partakes of the nature of an estate, and exclusive possession of the leased premises is essential to its character. (*Holladay v. Chicago Arc Light & Power Co.*, 55 Ill.App. 463, 467; compare *Alwood v. Ruckman*, 21 Ill. 200; *R.J. Gunning Co. v. Cusack*, 50 Ill.App. 290.) In this case, it is not disputed that on the day of the transaction between the two corporations, Rothschild was in possession of two stores as the tenant for a term of years under written leases.

■■ Whether a transaction is the assignment of a lease depends on its nature, the language employed, and all the circumstances of the case. (*Lemons v. Knox* (1951), 72 Ariz. 177, 232 P.2d 383; *Dodson v. McElreath* (1950), 210 Miss. 160, 48 S.2d 861; *Branmar Theater Co. v. Branmar, Inc.* (Del. Ch. 1970), 264 A.2d 526; 51C C.J.S. *Landlord &*

*Tenant* § 37(1)a (1968).) And generally, whether the assignment of a lease has actually occurred is a question of law. (Compare *Berry v. Blackard Construction Co.,* 13 Ill.App.3d 768, 300 N.E.2d 627; see *Gow v. Buckminster Hotel, Inc.* (1958), 336 Mass. 606, 146 N.E.2d 928.) The "Assignment and Assumption" agreement contained words that expressed the concept of assignment and labeled Rothschild the "assigner" and Botany the "assignee." However, it is well-established that the legal effect to be given an instrument is not determined by the label it bears or the technical terms it contains. *Bonde v. Weber,* 6 Ill.2d 365, 377, 128 N.E.2d 883; compare *Chicago Housing Authority v. United States Fidelity & Guaranty Co.,* 49 Ill.App.2d 407, 199 N.E.2d 217.

■■ Therefore, in construing the "Assignment and Assumption" agreement, we are bound by the rule that an assignment of a lease occurs where the lessee transfers the entire unexpired remainder of the term created by his lease. For example, where he assigns his whole estate without reserving to himself a reversionary property interest, a privity of estate is at once created between his transferee and the original lessor, and in such a case, the transfer is an assignment. (*Sexton v. Chicago Storage Co.,* 129 Ill. 318, 326, 21 N.E. 920.) But if he reserves or retains any reversion in the leased premises, however small, the privity of estate between his transferee and the original landlord is not established; and in such a case there is no assignment. (Kratovil, Real Estate Law 337 (5th ed. 1969); 1 Rasch, Landlord & Tenant § 35 (1950); 1 Tiffany, The Law of Real Property § 123 (3d ed. 1939); 1 Tiffany, The Law of Landlord & Tenant § 151 (1910).) It clearly appears in this case that Rothschild, by the terms of the "Assignment and Assumption" agreement, retained interests in the two leases sufficient to preclude any notion that it had assigned its tenancy. It expressly reserved the right to use and occupy the leased premises for the balance of the terms. For these reasons, we conclude that the agreement was not an assignment of the leases.[3] The "Sublease" from Botany did nothing more than confirm the reversions, although a different rent was to be paid. (See *Taylor v. Marshall,* 255 Ill. 545, 99 N.E. 638.) As a result, at the conclusion of the agreements of October 31, 1971, Rothschild continued in possession of the lands described in the leases.

---

[3] It is for this reason that the "Surrender Agreement" executed by Botany was ineffectual as it related to the premises here in issue. A surrender is the yielding up of an estate so that the leasehold interest becomes extinct by mutual agreement. (*Johnson v. Northern Trust Co.,* 265 Ill. 263, 270, 106 N.E. 814; *Peirce v. Conant,* 47 Ill.App.2d 294, 301, 198 N.E.2d 555.) Absent possession or a superior right thereto, Botany was without the interest in property necessary to effect the purported surrender.

## II.

■■■ In the broadest sense, one who holds or possesses lands or tenements by any kind of right or title, whether in fee, for life, for years, at will or otherwise, is a tenant. (*Hosford v. Ballard* (1868), 39 N.Y. 147, 151; *Caldwell v. Thiessen* (1939), 60 Idaho 515, 92 P.2d 1047.) Therefore, a tenant is anyone who lawfully occupies or has temporary possession of land whose title is in another. (*Insurance Co. v. O'Connell*, 34 Ill.App. 357, 361; I.L.P. *Landlord and Tenant* § 2 (1956).) He is one who has the temporary use and occupancy of real property owned by another person, called the landlord, with the relation, duration and terms of the tenancy usually fixed by an instrument called a lease. See 51C C.J.S. *Landlord & Tenant* § 1 (1968); Black's Law Dictionary 1635 (rev. 4th ed. 1951).

Possession and occupancy are essential for the relation. If a lessee under a written lease does not go into possession of the leased premises, the relation of landlord and tenant does not arise; the relation is that of lessor and lessee. (*Simon v. Kirkpatrick* (1927), 141 S.C. 251, 256, 139 S.E. 614, 616; *Bunch v. Elizabeth City Lumber Co.* (1903), 134 N. C. 116, 118, 46 S. E. 24, 25.) Where two parties agree to a lease of an estate for years to begin at a future date but entry is not made, the lessee has what the old authorities spoke of as an *interesse termini;* that is, the lessee is in a position where only entry is necessary to turn him into a full fledged tenant for years. 2 Powell, The Law of Real Property § 223 (1973).

■■ From these sources of the law, we see that in common parlance a tenancy arises or one becomes a tenant when he enters into the use, possession, or occupation of land belonging to another. (See *Illinois Central R.R. Co. v. Michigan Central R.R. Co.*, 18 Ill.App.2d 462, 477, 152 N.E.2d 627; *Friend v. Gem International, Inc.* (Mo. App. 1971), 476 S.W.2d 134, 137-38.) In the record before us, it is not claimed that at any time Botany had possession of the leased premises or had a right to possession that was superior to Rothschild's.[4] For this reason we conclude, as did the trial judge, that on April 25, 1972, when Botany filed

---

[4] An examination of the cases cited by the parties, as well as those produced by our research, reveals that the question implicit in this case is a novel one. (See *Stamm v. Buchanan* (1951), 55 N.M. 127, 132, 227 P.2d 633, 636; *Waukegan Times Theatre Corp. v. Conrad*, 324 Ill.App. 622, 59 N.E.2d 308.) The factor common in all of the cases we have examined is that the party whose bankruptcy is asserted to support the claim of forfeiture actually occupied the premises at some time. In the cases upholding forfeiture, the party occupied the premises at the time of the bankrupty. See *Model Dairy Co. v. Foltis-Fisher, Inc.* (2d Cir. 1933), 67 F.2d 704; *In re Famous Fain Co.* (2d Cir. 1926), 13 F.2d 529; *Empress Theatre Co. v. Horton* (8th Cir. 1920), 266 F. 657; *In re Lindy-Friedman Clothing Co.* (N. D. Ala. 1921), 275 F. 453.

for reorganization under the bankruptcy act, Rothschild was the tenant under the two leases. It was not involved in any bankruptcy; the provisions of the leases concerning bankruptcy proceedings could not be made applicable to Rothschild. Therefore, the trial court correctly ruled that the notices of termination served by the landlords were invalid. We agree with the trial court that, under the circumstances shown in the record, the landlords could not terminate the leases for non-payment of rent. (See *Madison v. Rosser,* 3 Ill.App.3d 851, 279 N.E.2d 375.) The judgment is affirmed.

Affirmed.

STAMOS, J., concurs.

Mr. JUSTICE HAYES, specially concurring:

I concur in the result, but I wish to express the line of reasoning by which I reach that result.

An essential element of tenancy is that, as between landlord and tenant, the tenant is either in lawful actual possession of the leased premises (whether personally or through a sub-tenant) with the landlord's assent and in subordination to the landlord's title, or he has the legal right to the immediate possession of the said premises by the landlord's assent and in subordination to the landlord's title. Wood, A Treatise on the Law of Landlord & Tenant § 1 (1881); Taylor, The American Law of Landlord & Tenant § 14 (9th ed. 1904); *Merki v. Merki* (1904), 113 Ill.App. 518, 520, *aff'd* (1904), 212 Ill. 121, 72 N.E. 9; *Lasher v. Redevelopment Authority* (1967), 211 Pa. Super. 408, 236 A.2d 831, 833; *Gates v. Herberger* (1938), 202 Minn. 610, 279 N.W. 711, 712.

In the instant case, the "assignment" of the assignor's leasehold estate under each of the two prime leases contained the following relevant sentences:

> "Assignor does hereby assign to Assignee all of the Assignor's right, title and interest as lessee in the following leases subject to Assignor's right to occupy the premises demised thereunder.
>
> Assignee does hereby accept and assume and agree to observe and perform all of the terms, covenants and condition of the [said] Leases * * * on the lessee's or tenant's part to be performed thereunder subject to the rights of Assignor to occupancy under the Leases * * *."

It is conceded that the estate purported to be transferred was to endure for the entire remaining balance of the term of each prime lease.

Our supreme court has had occasion to define the phrase "subject to" as meaning "subordinate to," "subservient to," or "limited by." (*Engle-*

*stein v. Mintz* (1931), 345 Ill. 48, 61, 177 N.E. 746.) Hence, in a transfer of property rights in which the transferor expressly makes the transfer "subject to" the continuation in himself of one of his then existing rights in and to the premises, the phrase "subject to" operates as a reservation of the said right by the transferor. (*Dagrosa v. Calabro* (Sup. Ct. 1951), 105 N.Y.S. 2d 178, 181.) In the words of our supreme court, the instant transfer was expressly made "subordinate to," and is expressly "limited by," the continuation of the said right in the transferor for the entire remaining balance of the term of the prime lease. We note further that, in the instant case, not only did the assignor expressly make the transfer "subject to" the continuation in itself of the right of occupancy which it then held under the respective prime leases, but the "Assignee" also expressly accepted the transfer "subject to" the continuation in the "Assignor" of the said right under the prime leases. Under the language of the "assignment," therefore, it is clear that the assignor's right to occupy the leased premises derived, not from the assignee, but from the landlord by and through the prime leases.

Under the terms of a companion instrument by and between Rothschild and Botany (which the parties designated a "sublease"), Botany promised Rothschild that Botany would pay the rent reserved under the prime lease to the landlord therein, and Rothschild promised to pay a different rent to Botany. Rothschild also agreed that Botany was to have the power to terminate Rothschild's occupancy in either of two specified events, neither of which ever occurred. It is significant that this "sublease" did not purport to transfer any right of or to occupancy from Botany to Rothschild. When the companion instruments are read together, they confirm each other in establishing that the parties intended Rothschild's right to occupy the leased premises to be, and to continue to be, the right to occupancy which Rothschild then had under the prime lease involved. Even assuming, without deciding, that the "sublease" created a power in Botany to terminate Rothschild's occupancy, that power is irrelevant to the continuation of the landlord-tenant relationship between Rothschild and its landlord under the prime leases, since the power never became exercisable.

For the purposes of this case, I do not think it necessary to decide what property rights, if any, were transferred to or created in Botany and were subsequently "released" by Botany to the landlords under the prime leases. It suffices that the reserved right derived from the prime lease is the very right which is the essence of tenancy: the actual possession of the leased premises with the assent of the landlord and subject to his ownership right. Assignor Rothschild expressly reserved its right to occupancy of the premises, which was one of the rights it then had as

against the landlord under the respective prime leases; and assignee Botany accepted the transfer subject to the right of assignor Rothschild to occupancy under the respective prime leases. Hence, under the terms of the assignment, assignee Botany never was in actual possession of the leased premises. Nor did it ever have, as against either the landlord or Rothschild, the right to the immediate possession of the leased premises. For that reason, assignee Botany never became the tenant under the prime leases.

Conversely, assignor Rothschild was, and was to continue to be, in actual possession of the leased premises under the right to occupy them which it then held under the prime lease, and, as against both the landlord and Botany, had and was to continue to have the right to immediate possession of the said premises for the entire remaining balance of the term of the respective prime leases. Hence, Rothschild remained the tenant under the prime leases. Since it is conceded that Rothschild never went into bankruptcy, the respective landlord's power to terminate the prime lease in that event never became exercisable.