This appeal involves a written settlement agreement which was found to be ambiguous because one party "believed" and "intended" for the agreement to cover certain special nursing charges. The trial court then ordered Blue Cross and Blue Shield (Blue Cross) to pay James and Lois Beck (the Becks) $9,888.56, representing special nursing charges incurred by the Becks' daughter (Laura) while confined in the hospital. Blue Cross appeals.
This suit was brought by the Becks for damages and for injunctive relief requiring Blue Cross and the Employee's Health Benefit Plan for Employees of AmSouth Bank Bancorporation (AmSouth's plan) to provide benefits for the psychiatric confinement and treatment of their daughter, Laura, at a psychiatric facility named The Institute of Living (the Institute). Mr. Beck was an employee of AmSouth, and Laura was a dependent under AmSouth's plan. Coverage for Laura's confinement at the Institute had been denied because the Institute is a "specialty psychiatric facility," rather than a "general hospital," and the pertinent coverage under AmSouth's plan for inpatient care for mental and nervous disorders is expressly limited to "general hospitals" and excludes "specialty psychiatric facilities."
Ultimately, the parties reached an agreement of settlement under which Laura would be permitted to continue to receive benefits for a specified period under AmSouth's plan for treatment at the Institute.
The essence of this agreement constituted a deviation from the provisions of the plan. This deviation would accommodate the Becks in that the intense and highly specialized treatment for Laura at the Institute would be better than she could receive at a general hospital. The duration of her hospitalization at the Institute, estimated to be one half the time required at a general hospital, was much desired by the Becks and would obviously benefit Blue Cross by reducing its financial exposure by up to $149,000. This agreement was recorded in writing in a letter from Blue Cross's counsel to the Becks' counsel and in a responsive letter from the Becks' attorney to Blue Cross's attorney. Both letters in pertinent part are set out below:
(First Letter — May 24, 1985)
 "This will record the agreement reached by you on behalf of Mr. and Mrs. James G. Beck and Ms. Laura Beck, by AmSouth Bancorporation ("AmSouth"), and by Blue Cross and Blue Shield of Alabama ("Blue Cross") with respect to the provision of health care benefits for Laura Beck and the payment of certain other expenses in resolution and discharge of the claims asserted by Mr. and Mrs. Beck in the above referenced suit against Blue Cross and Employee's Health Benefit Plan for Employees of AmSouth Bancorporation and Its Participating Affiliates ("the Plan").
 "First, Blue Cross and AmSouth will provide benefits under the terms of the Plan for the treatment of Laura Beck at The Institute of Living in Hartford, Connecticut, as though The Institute were a general hospital for the period of time from the commencement of her confinement there on October 25, 1984, until December 15, 1985. It is understood that the provision of benefits for her confinement and treatment at The Institute *Page 123 of Living shall be subject to all of the conditions and limitations of the Plan
(including, without limitation, the requirements therein that services be medically necessary and not for custodial care) other than the exclusion from major medical coverage of inpatient care and treatment for mental and nervous disorders in a facility other than a general hospital. After December 15, 1985, any further necessary confinement and treatment of Laura Beck for mental and nervous conditions must be only at a facility which is in a general hospital for which major medical benefits are covered under the terms of the Plan.
 "Second, Blue Cross will compensate your firm for the legal expenses incurred in connection with the handling of the above referenced case, the amount of which we understand to be in the neighborhood of $17,000.00.
 "Third, the Becks will execute releases in favor of Blue Cross, AmSouth, and the Plan releasing and discharging each of them from all claims and also will dismiss all claims against them pending in the above referenced suit. We will draft and forward to you releases for their execution.
 "I trust that the foregoing accurately states our agreement in the premises. If in any fashion it does not, or if you should have any comments or questions of any kind, please do not hesitate to let me know." (Emphasis added.)
(Responsive Letter — May 28, 1985)
 "Your letter dated May 24, 1985, accurately reflects our settlement agreement with two additions: (1) the return of James G. Beck's $1,500.00 deposit at The Institute of Living which was required of him upon Laura's admission, which deposit was drawn against by The Institute of Living and credited against Beck's account; and (2) the return of the $500.00 cash bond posted by the Becks prior to issuance of the Temporary Restraining Order in this case.
 "For your information the attorneys fees and expenses incurred in connection with this case total $16,949.14.
 "We look forward to concluding the settlement of this matter."
Thereafter, in accordance with the above settlement agreement, benefits were paid by Blue Cross under the terms of AmSouth's plan for Laura's confinement and treatment at the Institute. Benefits were not paid, however, for certain services of private or "special duty nurses" (known as psychiatric technicians, who were not registered or licensed professional nurses), whose charges totaled $9,888.56. Blue Cross denied that these charges were covered under the terms of AmSouth's plan in that coverage of benefits for private duty nursing was expressly restricted to services of licensed professional nurses and licensed practical nurses.
At issue in this case is whether the special nursing services of the "psychiatric technicians" are to be paid by Blue Cross. The Becks contend that the above settlement agreement is vague and ambiguous and that it was the intention of the parties that these charges be paid.
It is without dispute that no patent ambiguity is present, but the Becks insist that a latent ambiguity exists. Their position is that Blue Cross should have specifically excluded the payment for special nursing services within the language of the agreement if it was not going to stand responsible for these expenses. They highlight this in their brief here by saying, "[t]he subject of the Institute's charges for the care and treatment of Laura by its psychiatric technicians was never discussed prior to the settlement." They support this argument by further saying,
 "[t]here is simply no evidence that the parties intended, when they agreed upon a settlement, to exclude from payment by Blue Cross almost $10,000 in psychiatric technician charges, when none of the attorneys who entered into the settlement had any knowledge whatsoever of the existence of those charges."
Their reliance that Blue Cross's failure to specifically "exclude" payment of these charges creates a latent ambiguity is misplaced. It seems clear, as Blue Cross contends, that no such specific "exclusion" *Page 124 
was required because the written agreement under the first paragraph hereinabove set out "will provide benefits under the terms of the plan" and "that the provision of benefits for her confinement at the Institute of the Living shall be subject to all of the conditions and limitations of the plan" indicates that the plan controls where no special exception in favor of the Becks is made. The plan expressly restricted payment to services provided by licensed professional nurses and licensed practical nurses. The psychiatric technicians qualify as neither.
For a latent ambiguity to exist, no doubt or uncertainty appears on the face of the paper, "but by proof aliunde, the language is shown to be alike applicable to two or more persons [or] things." See, Chambers v. Ringstaff, 69 Ala. 140,144 (1881).
At the outset, we note that the determination of whether a contract is ambiguous is a question of law which has no presumption of correctness on appeal. Federated GuarantyLife Ins. Co. v. Dunn, 439 So.2d 1283 (Ala.Civ.App. 1983). We are also aware that upon a correct finding by a trial court that an ambiguity in a contract does exist, the extrinsic evidence then allowed by the trial court for its determination of the true meaning of the agreement comes here within theore tenus rule. Mass. Appraisal Services, Inc. v.Carmichael, 404 So.2d 666 (Ala. 1981). We are unable, however, to reach consideration of the extrinsic evidence used by the trial court in its effort to determine the meaning of the agreement because we are not satisfied that this agreement is so vague and ambiguous as to require interpretation by the trial court.
The Becks admit that when the attorneys entered into the settlement, neither had knowledge of any charges for special nursing. Such absence of knowledge obviously excluded it from discussion and likewise from insertion into the written agreement. Since it is axiomatic that this special nursing care was in contravention of the standard provisions of AmSouth's plan, such special condition would have had to be made a part of the written agreement. It was not. We must therefore conclude that the written agreement possessed no patent ambiguity nor did the circumstances of the agreement precipitate conditions favorable to the existence of a latent ambiguity. An after-acquired intention on the part of a party to an agreement cannot work to create an ambiguity.
It is well established that, when courts are called upon to construe a writing, the plain and clear meaning of its terms must be given effect. Federated, supra. Likewise, the parties must be legally presumed to have intended what is plainly and clearly set out in the writing. Camp v.Milam, 291 Ala. 12, 277 So.2d 95 (1973). In determining the intent expressed in a writing, courts must look to the writing as a whole and to its nature, purpose, and subject matter. An ambiguity does not exist unless the instrument is reasonably susceptible to more than one meaning. Federated,supra. However, if only one reasonable meaning clearly emerges, the writing is unambiguous. Federated, supra.
In this case, the trial court's order is devoid of any explanation of any manner in which the settlement agreement is deemed ambiguous, and it appears to this court that no such ambiguity exists. On the contrary, only one reasonable interpretation of the settlement agreement exists: Laura Beck's treatment and confinement at the Institute will be covered by Blue Cross, but such treatment and confinement are subject to"all of the conditions and limitations of the Plan."
(Emphasis added.) As it is undisputed that AmSouth's plan does not cover such nursing charges at issue here, Blue Cross was not responsible under the settlement agreement to pay such charges.
In light of our conclusion that the settlement agreement is not ambiguous, the court erred in giving the agreement an interpretation or construction other than its plain and clear meaning. Federated, supra. Therefore, we must reverse.
This case is due to be reversed and remanded with instructions to enter a judgment not inconsistent with this opinion.
REVERSED AND REMANDED. *Page 125 
BRADLEY, P.J., concurs.
HOLMES, J., dissents.