**In re FARLEY INCORPORATED, Debtor.**

**Bankruptcy No. 89 B 15610.**

United States Bankruptcy Court, N.D. Illinois, E.D.

March 10, 1993.

**518**

Mark K. Thomas, Katten Muchin & Zavis, Chicago, IL, Scott Berman and Howard Becker, Kaye Scholer Fierman Hays & Handler, New York City, for debtor.

John Kneafsey, Nison & Eliott, Chicago, IL, for U.S. Die Casting.

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW ON APPLICATION OF U.S. DIE FOR SHEFFIELD LEASE PAYMENTS AS AN ADMINISTRATIVE EXPENSE

JACK B. SCHMETTERER, Bankruptcy Judge.

This is a proceeding under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C., in which debtor's Plan of reorganization has been confirmed.

U.S. Die Casting and Development Co., Inc. ("U.S. Die") has moved for payment of its claim as an administrative expense, by reason of its lease of a factory premise to debtor. The Debtor Farley, Inc. ("Farley") objected to the underlying claim and to this motion, claiming *inter alia* that it was no longer holder of a leasehold estate at the time of bankruptcy filing. Trial was held on one bifurcated issue, namely Farley's threshold objection that 11 U.S.C. § 365(d)(3) does not apply because it lacked leasehold estate. The Court now makes and enters Findings of Fact and Conclusions of Law and, by interlocutory order, overrules that objection subject to further proof as to damages and pleaded defenses not yet tried.

### FINDINGS OF FACT

#### I. *The Parties and the Original 1989 Lease*

The City of Sheffield, Alabama is a municipal corporation that owns a manufacturing facility located in Colbert County, Alabama (the "Premises"). This facility consists of land, buildings, and the machinery and equipment necessary for the production of aluminum die-cast products. U.S. Die is an Ohio corporation that took possession of the Premises pursuant to a lease agreement with the City of Sheffield, dated December 1, 1985.

U.S. Die leased the Premises to Doehler–Jarvis/Farley, Inc., a division of Farley, pursuant to an agreement executed on April 1, 1989 (the "Sheffield Lease"). Several provisions in this lease are relevant to the present analysis:

(1) The initial term of the lease was seven years. Farley had a right to renew for an additional seven years, but a $10 million penalty was added in the event that this right was not exercised.

(2) The rent payments consisted of either a minimum monthly payment or a percentage of the lessee's gross casting sales, whichever was greater.

(3) Farley agreed that the "Lease Premises shall be used and occupied for the purposes of manufacturing aluminum castings, and other incidental uses, and other [use] ..."

The purpose of this provision was expressly stated:

It is contemplated by the parties that the primary use of the Leased Premises and Leased Equipment intended by the Lessee is for the manufacture of aluminum castings, which said use is necessary in order for the Landlord to realize its percentage rent as herein provided.

(4) U.S. Die warranted that the Premises "are a suitable modern facility for the manufacturing of die castings and contain all the requisite services and facilities for such manufacturing."

(5) Farley pledged to maintain the Premises and the equipment therein at "commercially reasonable standards capable of producing first quality die cast parts."

(6) Farley further pledged to spend a minimum of $2 million a year (subject to certain contingencies) on capital expenditures. This provision obligated Farley to buy new equipment and/or refurbish old equipment during the term of the lease.

(7) Farley was required to obtain U.S. Die's consent before it could assign or sublet the Premises, and any assignee or sublessee would have to pay rent according to the percentage of gross sales formula set out in the lease.

These provisions demonstrate the purpose of the Sheffield Lease: U.S. Die and Farley were to share in the benefits derived from the operation and maintenance of an aluminum die-casting facility on the Premises. The value of the Premises was to be maximized by running a modern aluminum die-casting operation. The value of the manufacturing Premises would certainly be diminished if it were moth-balled, and no evidence was presented to show that the Premises could now be utilized for any other purpose without considerable retrofitting and expense. If the Sheffield Lease were now viewed as a mere exchange of money for the unfettered use of property, then all of the above-mentioned provisions would be rendered meaningless.

One other relevant provision in the Sheffield Lease was the agreement that disputes concerning the lease be governed by Alabama law.

## II. Farley's Assignment of the Sheffield Lease

### A. Events and Communications Leading Up to the Assignment

Sometime in 1990, Farley planned to transfer the assets and liabilities of its Doehler–Jarvis Division to the ICM/Doehler–Jarvis Limited Partnership ("D–J"). This new entity is a Delaware limited partnership, and it is not a division or subsidiary of Farley, Inc. As part of this transaction, Farley intended to assign its interest in the Sheffield Lease to D–J.

During March or April of 1990, Charles Craig, a representative of Farley, contacted Dave Slyman, Sr., President of U.S. Die, to inquire about U.S. Die's position concerning the replacement of Farley on the Sheffield Lease with the future buyer of Farley's D–J Division. Mr. Slyman advised him that, while U.S. Die would consider adding any appropriate new party to the lease along with Farley, it would not agree to any arrangement whereby Farley would be released from any of its duties and obligations as a tenant under the lease.

Consistent with Mr. Slyman's concerns, U.S. Die's attorney Jesse Keller requested information on ICM Industries, Inc. ("ICM"), the entity that owned the general partner of D–J. Mr. Keller further requested that ICM sign a Lease Assumption by which ICM would promise to "assume all of the covenants, requirements, conditions, and obligations of the [Sheffield Lease]." U.S. Die was clearly concerned with D–J's ability to operate the die-casting facility in accord with the terms and conditions of the Sheffield Lease.

On July 2, 1990, Ross Miller, an attorney representing Farley, informed David Slyman, Jr., an employee of U.S. Die, by telephone that Farley was assigning all of its rights, title, and interest in the Sheffield Lease to D–J and that Farley wanted to be

released from all of its obligations under the Lease. That same day, Mr. Miller forwarded to Mr. Slyman copies of the following documents it proposed: (i) a Lease Assignment and Assumption and a Consent of U.S. Die to the Assignment and Assumption; (ii) a Non–Disturbance Agreement; and (iii) an Attornment Agreement addressed to D–J's lenders. The proposed draft Lease Assignment and Assumption provided that Farley was assigning all of its "right, title and interest in and to the Sheffield Lease" to D–J. The proposed draft Consent provided:

[U.S. Die], as lessor under the Sheffield Lease, does hereby consent to the foregoing Assignment and Assumption of the Sheffield Lease, and agrees that Assignee shall be entitled to all rights and benefits thereunder to the same extent as the Assignor thereunder, this _____ day of July, 1990.

The proposed draft Attornment Agreement provided in pertinent part:

We [U.S. Die] have been advised that Farley has agreed to sell and assign certain of its assets to Doehler–Jarvis Limited Partnership, a Delaware limited partnership (the "Borrower"), including, without limitation, the rights and obligations of Farley under the Lease and title to the assets of Farley located on the Premises.

\*    \*    \*    \*    \*    \*

As a condition to the loans and other financial accommodations of the Agent and the Lenders to the Borrower, the Lenders require, among other things, liens on all of Borrower's property located or to be located on the Premises ("Collateral"), *and that the Borrower create a leasehold security interest in favor of the agent covering the Borrower's leasehold estate created by and under the Lease (the "Leasehold Mortgage").*

... the undersigned hereby consents to the execution and delivery of the Leasehold Mortgage ... and further states and agrees as follows:

(i) *the undersigned consents to the assignment by Farley to Borrower of Far-*

*ley's rights and obligations under the lease; ...*

(Emphasis added.)

By letter to Mr. Miller dated July 10, 1990, Mr. Keller responded that,

U.S. Die will not consent to any assignment of the lease unless the assignment instrument says on its face that by virtue of the assignment, Farley, Inc. is not released under the covenants, obligations and requirements as the Tenant under the lease. We also want Farley, Inc. to acknowledge that their Company is still liable to U.S. Die under the terms of the lease, notwithstanding any assignment.

At this point, it was clear that Farley wanted to be released from the lease, and U.S. Die refused to allow it to be released.

On July 18, 1990, Mr. Keller sent Mr. Miller a revised Consent and Attornment Agreement. The redrafted Consent left the language in the initial draft intact, but added the phrase

provided however, it is expressly understood that by executing this Consent that *the undersigned does not release Farley, Inc., the named Lessee, and the aforesaid Farley, Inc. remains bound and liable under all the terms and conditions of the aforesaid Lease*, and the Assignee, ICM/DJ Limited Partnership, accepts the assigned Lease and all of the present terms and conditions contained therein, this __ day of July, 1990.

(Emphasis added.)

The redrafted Attornment Agreement made certain important changes that made that Agreement subject to terms of the applicable lease documents, so that any contrary provisions in the Attornment Agreement would be subordinated to the lease documents. To this end, Mr. Keller added a proviso (typed all in capital letters) at the end of the Attornment Agreement:

NOTWITHSTANDING ANY OF THE ABOVE AND FOREGOING PROVISIONS, CONTINENTAL BANK N.A. (THE "AGENT") AND EACH OF THE LENDERS ACKNOWLEDGE BY THE ACCEPTANCE OF THIS AGREEMENT THAT ... IN THE EVENT THE AGENT OR LENDER SHALL SUC-

CEED TO THE INTEREST OF ICM/D–J LTD. PARTNERSHIP, SAID AGENT OR LENDER SHALL SUCCEED ONLY UNDER THE TERMS AND CONDITIONS OF SAID LEASE ... AND ANY PROVISION IN THIS ATTORNMENT AGREEMENT OR THE LEASEHOLD MORTGAGE THAT CONFLICT WITH THE TERMS OF SAID LEASE SHALL BE NULL AND VOID.

The draft originally proposed by Mr. Miller had contained three provisions (paragraphs ix through xi) in which U.S. Die waived certain rights to proceed against D–J in the event that it defaulted on the terms of the Sheffield Lease. Mr. Keller's proposed draft on behalf of U.S. Die removed those provisions. However, there was no change in those paragraphs of the Attornment Agreement wherein U.S. Die was to state its understanding that D–J was giving a leasehold security interest covering its "leasehold estate" to be created by the Assignment. Nor was the language changed in the Consent whereby U.S. Die was to consent to the assignment by Farley to D–J of Farley's "rights and benefits" under the Lease.

On July 16, 1990, Kenneth Greenbaum, Vice–President of Farley, sent a letter to U.S. Die wherein he stated:

> We hereby acknowledge that your consent to the assignment and assumption of an April 1, 1989 lease to Doehler–Jarvis Limited Partnership will not release us from liability under said lease.

**B.  The Assignment and Related Documents**

On July 20, 1990, Farley executed a Lease Assignment and Assumption (the "Assignment"). Pursuant to the terms of the Assignment, Farley assigned "all its right, title and interest" to the Sheffield Lease to D–J. That same day, D–J executed an "Acceptance" of the Assignment.

On July 23, 1990, U.S. Die executed its "Consent" to the Assignment. The language of this Consent was identical to Mr. Keller's proposed draft, including the proviso that made clear Farley was not released from the Lease and further conditioned

U.S. Die's consent on the understanding that Farley would remain "bound and liable under all the terms and conditions of the [Sheffield Lease]." Consents were also executed by the City of Sheffield and the County of Colbert, Alabama. Both of these Consents contained a condition that "[s]aid consent does not release Farley, Inc. or [U.S. Die] from any liabilities under said lease or otherwise."

U.S. Die also executed an Attornment Agreement which was a compromise between the proposed drafts of Messrs. Miller and Keller. Provisions relevant to the present issue were:

> (1) In paragraph (i), U.S. Die stated that it "consents to the assignment by Farley to [D–J] of Farley's rights and obligations under the Lease."

> (2) Paragraph (viii) stated,

> the Lease, following its assignment, will represent the full and complete agreement between [D–J] and [U.S. Die] concerning the Premises and the Lease, *and Lease shall not be amended or modified in any manner which would affect [D–J's] business operations* or the Collateral or the Premises in any material respect....

(Emphasis supplied.)

> (3) In paragraph (x), U.S. Die agreed to waive certain rights that it may have had against D–J's assets in the event that D–J did not pay rent.

> (4) In paragraph (xiv), U.S. Die agreed that if D–J defaulted on its obligations to its lenders under the leasehold mortgage agreement, then the lenders would have the right to lease out the Premises to a third party.

However, all these provisions were limited by a statement placed in capital letters at the end of the agreement, "any provision in this attornment agreement or the leasehold mortgage that conflict with the terms of the [Sheffield Lease] shall be null and void."

**C.  Post–Assignment Dispute Between U.S. Die, Farley, and D–J**

Shortly after the execution of the Assignment and Consent, Farley turned over

possession of the Premises to D–J. Sometime later, a dispute arose between D–J and U.S. Die, and D–J threatened to vacate the premises. Mr. Slyman, Sr. sent an officer of D–J a letter which stated,

we expect and will require full compliance by you of all the terms and conditions of the Lease. As you know, at the time [that U.S. Die] consented to the Assignment, it was expressly provided that the original Lessee [Farley], was not released in any respect from the terms and conditions of the Lease, and we are sending that Company a copy of this letter, so that they will be put on notice that we are looking to both the Assignee, [D–J], and the Assignor, [Farley], for full compliance and performance under the terms of the [Sheffield Lease].

A copy of this letter was then sent to Farley.

Farley alleges that D–J remained in possession of the Premises until February 29, 1992, when it closed its operations there. D–J vacated the Premises, allegedly due to environmental hazards which made the facility unusable.[1] Since then, a dispute arose between Farley, D–J, and U.S. Die as to whether Farley and/or D–J are liable for unpaid rent and other obligations under the Sheffield Lease.

Farley did not resume possession of the Premises after D–J vacated. However, U.S. Die contends that Farley remains liable for all the terms and obligations of the Sheffield Lease.

### III. *Procedural Background of this Dispute in Bankruptcy*

On July 24, 1991, an involuntary Chapter 7 petition was filed against Farley. On September 24, 1991 (the "Filing Date"), Farley consented to an order for relief under Chapter 11 of the Bankruptcy Code, and exercised its right to convert the proceeding to one under that chapter. Since then, Farley continued in the management and possession of its businesses and properties as a debtor-in-possession, until its

Plan of Reorganization was confirmed. To avoid the rejection of leases 60 days after the filing date under § 365(d)(4) of the Code, on November 24, 1991 debtor sought and obtained an order extending its time to assume or reject "any and all leases" until the confirmation date or an earlier order of court. This blanket order applied to the Sheffield Lease unless, of course, Farley was no longer a tenant under that lease, as it contends.

On April 16, 1992, U.S. Die filed its amended proof of claim, seeking damages of $41,579,412 plus attorneys' fees and repair expenses. In Count I of U.S. Die's amended proof of claim, it asserts that Farley, by its actions in connection with the Assignment of the Sheffield Lease, guaranteed payment of D–J's obligations. Alternatively, U.S. Die asserted in Count II that Farley remained liable because it was not released from its obligations under the Sheffield Lease.

Farley moved for an order limiting U.S. Die's claim in accordance with the statutory maximum set forth in 11 U.S.C. § 502(b)(6). Following hearing and briefings, this Court concluded and ordered that the § 502(b)(6) maximum applies to U.S. Die's amended proof of claim. *In re Farley, Inc.*, 146 B.R. 739 (Bankr.N.D.Ill.1992).

U.S. Die also moved for an order compelling Farley to assume or reject the Sheffield Lease. Farley maintains that it could not be called on to assume or reject the Sheffield Lease because it had absolutely and unconditionally assigned its entire interest therein to D–J. Farley argues that following the assignment, it was left with no real property interest or leasehold estate that would form the basis of an unexpired lease capable of assumption or rejection. On August 12, 1992, this Court ordered that, to the extent that it was an executory contract, the Sheffield Lease was deemed rejected effective August 7, 1992.

---

1. There are issues of fact as to whether environmental hazards are on the Premises, and whether the presence of such hazards relieves Farley of any liability to U.S. Die under the Sheffield Lease. Indeed, litigation is currently pending between U.S. Die, D–J, and Farley on such issues. However, these issues are not addressed in this ruling.

On August 19, 1992, U.S. Die filed its Application under 11 U.S.C. § 365(d)(3) for payment of obligations under the Sheffield Lease as an administrative expense of Farley's estate for the period from September 24, 1991 (the Chapter 11 Filing Date) through August 7, 1992. The amount claimed due is $3,814,281.69.[2] Farley, the Bank of New York (Farley's primary secured lender under an approved DIP Financing Agreement), and the Official Unsecured Creditor's Committee have all filed responses objecting to U.S. Die's § 365(d)(3) motion.

Farley has asserted as one of its defenses that the legal effect of the Lease Assignment and Assumption was to deprive Farley of privity of estate and to render it simply a guarantor of D–J's debts under the lease in accordance with its residual contractual responsibilities. It concedes retaining all liabilities under the lease. However, Farley contends that, once the Assignment and other documents were executed, Farley no longer retained any rights under the lease, and therefore had no lease privity and no responsibility to reject the lease in bankruptcy. Its only conceded potential responsibility was for payment of damages on U.S. Die's pre-petition claim on a contractual basis. Farley therefore argues that it owes U.S. Die no "... obligations ... arising from and after the order for relief under any unexpired lease of nonresidential real property...." within the meaning of § 365(d)(3).

The Court severed this issue for trial. These Findings and Conclusions are the result of that trial. The parties reserved evidence pertaining to U.S. Die's asserted damages and to Farley's other defenses pleaded to the claim.

One interesting facet of the hearing deserves emphasis. Before hearing, both U.S. Die and Farley took the view that the wording of dispositive documents was unambiguous and could not be explained by parol evidence. However, each party also reserved the right to offer parol evidence if the Court found the writings to be such that parol evidence was admissible with respect thereto, and each offered parol and historical evidence which was received. As discussed below, the Court finds that dispositive documents militate in favor of U.S. Die on their face. However, even if those documents are viewed as contradictory and ambiguous, the parol and historical evidence corroborated the readings of those documents by U.S. Die.

## CONCLUSIONS OF LAW

### I. *Jurisdiction*

This matter is before the Court pursuant to 28 U.S.C. § 157, and is referred here under Local District Court Rule 2.33. Subject matter jurisdiction lies under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

### II. *365(d)(3) Applies Only to Lessee–Debtors*

Section 365(d)(3) provides in pertinent part that:

> (3) The trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title....

■ To qualify for treatment of § 365(d)(3), a landlord must first establish that its claim against the debtor (i) arose post-petition (ii) under an unexpired lease of non-residential real property.

■ However, the initial issue presented here is whether a landlord must also establish that the debtor was a *lessee* on the unexpired lease. An examination of the structure and legislative history of § 365(d)(3) suggests that the debtor must indeed be a lessee before this section applies. Under § 365(d)(3), a debtor's obligation to perform timely all its duties under a lease continues "until such lease is

---

**2.** The specific composition of post-petition lease payments allegedly due but remaining unpaid is set forth in U.S. Die's August 19 application for payment. Since no Findings or rulings are made at this time with respect to the elements of this claim, there is no need to detail those matters here.

assumed or rejected." A lease is "assumed" when the debtor agrees to retake or remain in possession of the leased premises and to fulfill the tenant's obligations of the lease agreement. *See In re Bell & Beckwith,* 139 B.R. 647, 649 (Bankr. N.D.Ohio 1991) ("Assumption of an unexpired lease must also result in the assumption of both the benefits and burdens of the contract"). Such action depends on the debtor's right to take possession of the premises after electing to assume the contract. If the debtor has no right of possession, then it has nothing to assume or reject, and § 365(d)(3) cannot then apply.

▪ Alabama authority provides that "the essential purpose of a lease is to create in the tenant a right to exclusive possession of the leased property." *Pieper v. American Sign/Outdoor Advertising, ·Inc.,* 564 So.2d 49 (Ala.1990). *See generally,* 51C C.J.S., Landlord & Tenant §§ 1-2 (discussing what constitutes a lease). When a party has no right of possession, there is no lease, and § 365(d)(3) cannot apply except in the context of a lease. Thus, when a debtor loses its right of possession due to assignment of all lease rights prior to filing of a Chapter 11 bankruptcy petition, it will have no obligation to assume or reject the assigned lease pursuant to § 365(d)(2) or to pay rent thereon as an administrative expense pursuant to § 365(d)(3). *In re Brooklyn Overall Co., Inc.,* 57 B.R. 999, 1004 (Bankr.E.D.N.Y. 1986).

▪ Moreover, courts have long recognized that administrative expenses should be narrowly construed so as to preserve the estate for the benefit of pre-petition creditors. *Matter of Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984); *In re CIS Corp.,* 142 B.R. 640, 642 (S.D.N.Y.1992); *In re Atlantic Container Corp.,* 133 B.R. 980, 992 (Bankr.N.D.Ill.1991); *In re Stoecker,* 128 B.R. 205, 208 (Bankr.N.D.Ill.1991). Thus, § 365(d)(3) cannot be read more broadly than its terms to apply to debtors who merely guarantee another party's obligations under a lease, but have no threshold interest of their own. If Farley was merely a guarantor, as it contends, and

was not a lessee at the time of the bankruptcy filing, it would not be liable under § 365(d)(3).

### III. *Farley Had a Leasehold Interest in the Sheffield Lease Even After the Assignment to D-J.*

▪ The foregoing analysis leads to the key issue before this Court—whether or not the July 1990 Assignment of Farley's rights to D-J stripped Farley of all rights to possess the Premises as a lessee. If Farley retained no right or potential right to possess or occupy the Premises, then it could not be a tenant under the Sheffield Lease. If Farley was not a tenant, then § 365(d)(3) could not apply to its obligations under the Sheffield Lease because it would have no leasehold interest to assume or reject under § 365(d)(2). However, as discussed below, Farley was a leasehold tenant even after the Assignment, and could have rejected its leasehold interest upon and after the Filing Date.

The starting point is the Sheffield Lease, which initially defined the relationship between Farley and U.S. Die. Under this document, Farley had the right to possess the Premises. Indeed, the purpose behind the Sheffield Lease was for Farley to operate and maintain an aluminum die-casting facility on the Premises. Rent was to be maximized, based on sales derived from this operation. This purpose could only be realized if Farley or some other permitted party occupied the Premises and manufactured aluminum castings thereon.

▪ Under Alabama law, Farley would continue to be a tenant with a right to possess the Premises for the remainder of the lease term unless it assigned its entire interest in the leasehold estate without retaining any reversionary interest. *See Pan American Petroleum Corp. v. Parker,* 230 Ala. 178, 160 So. 220, 223 (1935), *quoting Indian Refining Co. v. Roberts,* 97 Ind. App. 615, 181 N.E. 283, 285 (1932) ("where the lessee transfers his whole estate, without reserving to himself a reversion therein, a privity of estate is at once created between his transferee and the original lessor, and the instrument is in law an assign-

ment"). *See also,* 51C C.J.S., *supra* at § 37(1) (and cases cited therein). If Farley retained any reversionary interest in the Sheffield Lease, however small, then no complete assignment has occurred. *Id.; Pan American Petroleum Corp.,* 160 So. at 223.

In July of 1990, Farley signed the "Lease Assignment and Assumption" that assigned all of its "right, title and interest" in the Sheffield Lease to D–J. Nothing in this document specifically and expressly reserved to Farley any remainder or reversionary interest in the leasehold estate.

However, the Sheffield Lease provided that Farley could only assign or sublet its interest in the Premises with the reasonable consent of U.S. Die. Farley is not contending that this provision should be void and of no effect, nor is it contending that U.S. Die failed in its duty to act reasonably in consenting only conditionally to the July 1990 Assignment. Therefore, Farley's asserted assignment of its interest in the Sheffield Lease to D–J was subject to U.S. Die's consent. Indeed, the assignment could only be made to the extent of U.S. Die's consent thereto. C.J.S., *supra* at § 36(4) (consent to a sublet does not include the consent to assign).

Thus, the effect of U.S. Die's Consent on the assignment document executed by Farley must be assessed. This analysis includes examination of the Consent language as well as circumstances surrounding it. *See Urban Investment & Development Co. v. Rothschild,* 25 Ill.App.3d 546, 323 N.E.2d 588, 592 (1st Dist.1975) ("whether a transaction is the assignment of a lease depends on its nature, the language employed, and all the circumstances of the case").

■ U.S. Die expressly limited its Consent by stating that, "by executing this Consent, [U.S. Die] does not release Farley, Inc., the named Lessee, and the aforesaid Farley, Inc. remains bound and liable under all the terms and conditions of the aforesaid Lease...." This is the language that Farley argues imposes on it only the obligation of an indemnitor. However, the clear words do not permit such a cramped

reading. This language means what it says: that U.S. Die consented to allow D–J to operate as lessee under the Sheffield Lease only so long as Farley also remained a lessee. That way, U.S. Die could look to either D–J or Farley to enforce the provisions of its lease. Pursuant to the Sheffield Lease and U.S. Die's consent, Farley was allowed to assign a right of possession to D–J, but it was required to retain its position as lessee until the Sheffield Lease expired. Therefore, Farley retained the right to repossess the Premises before the expiration of the lease term in the event that D–J vacated or otherwise defaulted on the lease. This retained right of re-entry means that a complete assignment of all leasehold rights did not occur.

■ This conclusion is supported by other documents executed as part of the transaction. The City of Sheffield and Colbert County also refused to release Farley from "any liabilities under the [Sheffield Lease]". Furthermore, all of the promises and representations contained in the Attornment Agreement were expressly limited by the proviso which stated that any provision in the agreement that conflicted with the lease was null and void. This proviso has binding legal effect because, under the Sheffield Lease, the terms of any assignment, and therefore the rights of any assignee under the lease, could be limited by U.S. Die's consent. Thus, any attempted assignment that exceeded U.S. Die's consent was void, and U.S. Die was free to make clear to third parties that they could not assert rights to the Premises that exceeded the assignee's rights under the assignment and lease.

■ The pertinent documents use the term "assignment". However, labels and technical terms within a contractual document cannot be used to determine conclusively the legal effect of the document. *See Johnson v. Moxley,* 216 Ala. 466, 113 So. 656 (1927), and *Johnson v. Thompson,* 185 Ala. 666, 64 So. 554 (1914) (both holding that the distinction between an assignment and a sublease depends upon what rights are transferred or retained by the original lessee, and not upon the form of

**526**

the transaction). *See also Urban Investment and Development*, 323 N.E.2d at 592–93 (finding that the use of the term "assignment" was not determinative in deciding whether a transaction was an assignment or a sublease). In this case, Farley had given D–J the right to possess the Premises and operate under the terms of the Sheffield Lease. U.S. Die consented to this arrangement provided Farley remained bound as a lessee under the lease. Thus, Farley retained a right to repossess the Premises and operate the aluminum die-casting facility if D–J abandoned the Premises before the lease expired. However contingent that right was, it existed. The use of the term "assignment" was in the context of the intentions expressed in the documents that clearly limited the transfer of rights. That term cannot be taken out of context to defeat or otherwise erase such limitations.

■ Farley argues that, although not released from the Lease, it retained only obligations to pay money due under the Lease, not rights to occupy. In light of Farley's actual obligations under the Lease, that reading is impossible. Farley's obligations under the Lease were to maintain and operate the Premises as an aluminum die-casting facility. It owed rent measured not merely by the minimum due but also by the percentage of lessee's gross casting sales, if that were the greater rent figure. Farley could not possibly fulfill these obligations without right of possession if D–J breached. Since Farley was not released from the Lease, its admitted retention of all leasehold obligations ("all the terms and conditions") cannot be divorced from the possessing rights needed to fulfill its duties if D–J were to leave without lawful cause.

### IV. *The Use of Parol Evidence in this Case*

The parties have both argued that the Assignment and related documents are clear and unambiguous. However, they also each contend that, in the event the documents are found to be ambiguous, then the parties should be allowed to submit parol evidence to establish that their readings of the documents are correct. *See, e.g., Clark v. Albertville Nursing Home, Inc.*, 545 So.2d 9 (Ala.1989) (examining parol evidence to resolve an ambiguity in a lease). To this end, they each submitted lengthy arguments as to admissibility of parol evidence.

■ The Seventh Circuit has noted that, "although the parol evidence rule has a procedural name, it is in fact a rule of contract formation." *Mohr v. Metro East Manufacturing Co.*, 711 F.2d 69, 72 (7th Cir.1983). *See also Norfolk Shipbuilding & Drydock Corp. v. Nance*, 858 F.2d 182, 185 (4th Cir.1988) ("the parol evidence rule is a substantive rule of law, not a rule of evidence"). Therefore, this Court must look to Alabama law to resolve whether parol evidence is admissible in this case. *See McInnis v. A.M.F., Inc.*, 765 F.2d 240, 245 (1st Cir.1985) ("In spite of the general applicability of the Federal Rules of Evidence to diversity actions, it is well recognized that Congress did not intend the rules to preempt so-called 'substantive' state rules of evidence such as the parol evidence rule").

It is well settled under Alabama law that, "once a court determines that a contract is unambiguous, parol or extrinsic evidence will not be allowed as to that contract." *Rime Shatten Development Co. v. Birmingham Cable Commun. Co.*, 569 So.2d 332, 335 (Ala.1990). Evidence excluded under this rule consists of "all oral discussion, negotiations, or agreements had or made prior to the execution of the written contract." *Id.* Contractual language is deemed ambiguous only when an "instrument is reasonably susceptible to more than one meaning." *Blue Cross & Blue Shield v. Beck*, 523 So.2d 121, 124 (Ala.Civ.App.1988). *See also F.W. Woolworth Co. v. Grimmer*, 601 So.2d 1043, 1044 (Ala.Civ.App.1992) ("if only one reasonable meaning clearly emerges, the writing is unambiguous").

■ Here, the various documents are clear and unambiguous. For reasons stated above, it is concluded that the "Lease Assignment and Assumption", when read

in conjunction with U.S. Die's Consent and other documents executed in the course of this transaction, is only reasonably susceptible to one meaning. That is, the effect of the Assignment was to leave Farley with a right to re-enter the Premises in the event that D–J defaulted on the Sheffield Lease. This conclusion is reached without examining any evidence of prior communications, written or oral, between the parties concerning this transaction. Moreover, it flows from the "Lease Assignment and Assumption", the Consent thereto, the Attornment Agreement, the Sheffield Lease (which is explicitly referenced in all the documents), and other documents executed as part of the July 1990 Assignment.

However, a reviewing court may disagree with that conclusion, and find that the documents were ambiguous, or ambiguous when read together even if clear when read separately. If so, parol and historical evidence only corroborate the Court's reading of documents.

Evidence as to negotiations demonstrate that, prior to execution of the Assignment and related documents, Farley wished to assign its entire interest in the Sheffield Lease. It also wanted to be released from and be free of any obligations under this Lease after the assignment transaction was completed. On the other hand, U.S. Die did not know anything about the economics behind the formation and operation of D–J. Therefore, it was not agreeable to release of Farley from the Lease. These contradictory stances were revealed through the proposed draft Consents and Attornment Agreements, and the amended versions returned on behalf of U.S. Die.

Ultimately, Farley bowed to U.S. Die's demand that it remain as a lessee after the assignment to D–J. This history is evidenced by (i) Mr. Greenbaum's July 16 letter to Mr. Keller in which he acknowledged that the assignment to D–J would not release Farley from liability under the Sheffield Lease, (ii) the adoption of Mr. Keller's redraft of the Consent proposed on behalf of U.S. Die, and (iii) the Attornment provision added by Mr. Keller, making clear that

Lease documents superseded the Attornment provisions.

Thus, should the various documents be found reasonably susceptible to more than one meaning, the negotiations and communications preceding execution establish that the parties never intended to release Farley from the Sheffield Lease or to deprive Farley of a right and duty of re-entry in the event that D–J defaulted on the Lease.

Whether the documents alone are relied on or parol and historical evidence is also considered, the same result is reached. Farley cannot escape the consequences of its Lease and the limited and conditional Consent by U.S. Die to D–J taking over the plant. Those consequences now loom large in light of Farley's decision to obtain at the outset of its Chapter 11 proceedings a blanket order extending time to assume or reject all unexpired leases subject to further order of Court.

### V. *Remaining Issues*

The Sheffield Lease is a lease to Farley of non-residential property. It did not expire prior to the entry of the August 1992 Order, in which Farley rejected this Lease. Since Farley had a right to possess the leased Premises before lease rejection, § 365(d)(3) applies.

However, U.S. Die has not yet proven that it is entitled to the full amount of payment sought in its motion. Also, Farley has pleaded several defenses to both the instant motion and the underlying claim. None of these issues were addressed at the recent bifurcated trial.

The Creditors' Committee and the Bank of New York have both argued that, if allowed, any administrative payments due under § 365(d)(3) should be limited to unpaid lease obligations that accrued between the Filing Date and the end of February, 1992 (when D–J vacated the premises). They contend that rejection of the Sheffield Lease actually occurred at that time rather than on August 7, 1992 (when the Court Order was entered). Their argument is that "any act which clearly and unambiguously communicates to a lessor the debtor's intention to reject an unexpired lease is sufficient to terminate the period for which

that lessor can claim administrative rent pursuant to § 365(d)(3), even though court approval of the rejection comes at a later date." *Committee's Response to U.S. Die's Motion,* at ¶ 6.

Two courts have held that rejection of a lease may be accomplished by an unequivocal act of the trustee (or debtor-in-possession), and that administrative expense priorities will only be awarded for lease obligations due up until the date of that unequivocal act even though court approval of the rejection came at a later date. *In re Mid Region Petroleum, Inc.,* 111 B.R. 968 (Bankr.N.D.Okl.1990) *In re 1 Potato 2, Inc.,* 58 B.R. 752 (Bankr.D.Minn.1986). For example, in *Mid Region Petroleum,* the trustee sent a letter to the lessor on May 15, 1984 stating that the leases in question were cancelled, but an order approving the rejection was not entered until July 24, 1984. 111 B.R. at 969. The court only awarded rent payments as § 365(d)(3) administrative expense for the period between the date the petition for relief was filed and May 15.

However, when faced with this same issue, several other courts have determined that administrative rent is due up until the date of the court order approving the rejection. *Matter of Federated Department Stores, Inc.,* 131 B.R. 808 (S.D.Ohio 1991); *In re Worths Stores Corp.,* 130 B.R. 531 (Bankr.E.D.Mo.1991); *In re Virginia Packaging Supply Co.,* 122 B.R. 491 (Bankr.E.D.Va.1990); *In re Revco D.S., Inc.,* 109 B.R. 264 (Bankr.N.D.Ohio 1989). The reason for this position is that "§ 365 and the accompanying Bankruptcy Rules are designed to provide a degree of factual certainty in determining the actual date of rejection." *Federated Dep't Stores,* 131 B.R. at 815, *quoting Revco,* 109 B.R. at 269.

This issue cannot yet be addressed because evidence as to damages was not presented at the limited bifurcated hearing. Moreover, evidence has not yet been taken on the issue as to whether Farley committed an "unequivocal act" of rejection when D–J vacated the Premises.

**CONCLUSION**

Accordingly, by interlocutory order entered separately this day, the threshold objection of Farley to U.S. Die's motion for the payment of post-petition rent due under the Sheffield Lease pursuant to § 365(d)(3) is overruled. However, no order can now be entered on any other issue concerning this motion or U.S. Die's underlying claim. Remaining issues will be set for trial.